# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00373-CV

**Trudy's Texas Star, Inc. d/b/a South Congress Café, Appellant**

**v.**

**City of Austin, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. D-1-GV-05-004526, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## O P I N I O N

This case requires us to consider circumstances in which a municipality's regulatory discretion can be limited by estoppel or contract. Trudy's Texas Star, Inc. d/b/a South Congress Café (Trudy's) appeals a final summary judgment granting the City of Austin declaratory and injunctive relief requiring Trudy's to tear down an outdoor deck and other improvements it had constructed behind an existing restaurant building. There is no dispute that Trudy's constructed the improvements without obtaining advance approvals and permits from the City, as the City Code requires. However, Trudy's has presented summary-judgment evidence that the City not infrequently allows landowners who have built improvements without required approvals and permits to obtain them retroactively, that the City afforded Trudy's that opportunity here, and that the City even memorialized an obligation to provide Trudy's that opportunity in a Rule 11 agreement. Having done this, the City, Trudy's complains, then gave Trudy's representations and assurances for

almost eight months that it could bring its improvements into compliance with applicable City parking requirements by providing one handicapped parking space off-site and induced Trudy's to incur substantial expenses and inconvenience satisfying various City regulatory demands in securing that off-site handicapped parking space. Then, after initially approving Trudy's site plan (the linchpin in the City's land-use approval process), the City, Trudy's complains, reversed its position in response to neighborhood opposition and asserted that Trudy's could not provide the handicapped parking space off-site after all. In short, Trudy's complains that the City induced it for months to pursue, at great expense and inconvenience, an objective that the City now maintains was an exercise in futility.

On appeal, Trudy's challenges the summary judgment in four issues. In its first issue, it argues that the summary-judgment evidence raised a fact issue as to an affirmative defense that estoppel bound the City to act consistently with its prior assurances that Trudy's could satisfy City parking requirements by providing the handicapped space off-site. In its second and third issues, Trudy's contends that fact issues remain as to whether the City breached obligations under the Rule 11 agreement with Trudy's, which go to both affirmative defenses and counterclaims that Trudy's has asserted. Finally, in its fourth issue, Trudy's asserts that the district court's judgment granted relief not raised or requested in the City's summary-judgment motion.

Guided by recent Texas Supreme Court precedent, we cannot conclude that the summary-judgment evidence would support estopping the City under the circumstances here. However, we will sustain each of Trudy's other issues, reverse the judgment, and remand.

**BACKGROUND**

The parties' dispute arose against the backdrop of the City's land-use and development regulations, so a brief summary of relevant requirements is helpful in setting the context for their respective contentions. A person seeking to use or develop private property in the City may be required to obtain City approvals with respect to (in this order): (1) zoning, (2) subdivision restrictions, (3) a "site plan," and (4) building permits. Austin, Tex., Code of Ordinances § 25-1-61 (2009) (City Code).[1] The first layer of restrictions, zoning ordinances, impose general limitations on how property can be used (e.g., "commercial") and prescribes various restrictions tied to such categories of uses. The second layer, subdivision restrictions, do not appear to be immediately relevant here. Central to this appeal, however, is the site plan requirement.

Before a person may "change the use of property" or "develop property," and before the City issues a building permit allowing the person to do so, the person must secure the City's approval of a "site plan" that depicts the current and proposed use of the property and the design and layout of any proposed improvements. *See id.* § 25-5-1 (2009). The purpose of the site plan requirement is to make the applicant demonstrate and to enable the City to ascertain whether the specific planned use conforms to zoning and other applicable land development restrictions. Once a site plan is filed, the applicant has 180 days to convince the City to approve it, although the deadline may be extended. The summary-judgment evidence reflects that site plan approval can be a tedious and somewhat unpredictable process. The filed plan is assigned to a

---

[1] Where there has been no intervening material substantive change, we will cite the current version of the City Code for convenience.

3

team of City "reviewers" each of whom represent different areas of land use planning expertise (e.g., transportation, water quality, etc.). The reviewers are each required to provide "comments"—basically, objections or concerns regarding the site plan that, the record indicates, might or might not be based on any identifiable requirement of law—by a specified deadline. Once the reviewers generate comments, the applicant has the opportunity to address them, prepare an updated or amended site plan, and go through the review process again. This submission may elicit further comments and, depending on the applicant's ability or remaining desire to accommodate them, the process may continue for still more rounds of site plan updates and comments. Once the City reviewers' comments have been addressed to their satisfaction, the comments are deemed "cleared," denoting that the City is satisfied that any concerns have been resolved, and the site plan is approved. Once the site plan is approved, the site plan is "released" after the applicant posts security and the time for any appeal of the approval expires. *See id.* § 25-5-43 (2009). Release of the approved site plan is the linchpin in the applicant's ability to obtain the remaining permits and approvals required to construct the improvement. A building permit may not be issued until the site plan is released, and an applicant may not begin constructing any improvements called for in the site plan until a building permit is issued. *See id.*

Among the types of comments that may be elicited during the site plan review process is any contention by the City that the proposed use would violate zoning restrictions. In that instance, the applicant would either have to apply for and ultimately obtain appropriate zoning variances from the City's Board of Adjustment or change the proposed use to eliminate the violation.

Similarly, if the reviewers determine that the proposed use would include an incursion into City right-of-way, both a license and special permit for the use are required.

In addition to obtaining site plan approval when required, an applicant must obtain building permits before beginning new construction or additions, alterations, or repair to a building or structure. *See id.* §§ 25-11-32, 25-11-33 (2009). These may include permits related to plumbing, mechanical (e.g., air conditioning), electrical, fire and other safety requirements. Further, once building permits are secured and construction is completed, the building cannot be used until the work passes City building permit compliance inspections and the City issues a certificate of occupancy. *See id.* §§ 25-11-111, 25-1-361.

Against this regulatory backdrop, Trudy's, which already operated several Austin-area restaurants, decided in the early 2000s to open a new restaurant—the South Congress Café—at 1600 South Congress Avenue (the southwest corner of South Congress and West Monroe). At the time Trudy's began preparations to open the South Congress Café, the front or westmost portion of the lot at 1600 South Congress (the portion closest to South Congress) contained an existing building that had been used as a restaurant for several years, while the eastern half consisted of a dirt and gravel yard. Trudy's plan was to remodel the existing building and, at some point in the future, construct a deck over the gravel yard out back. The City Code generally requires businesses to "provide an off-street parking facility" for "a new building," "a new use," "an addition or enlargement of an existing building or use," or "a change in occupancy or operation that increases the number of needed parking spaces above the existing spaces." *See id.* § 25-6-471(A) (2009). The number of parking spaces a business is required to provide is calculated by a formula applied

to the building's floor space, and varies according to the use of the property (e.g., restaurant versus other commercial uses). *See id.* § 25-6-472 (2009). However, there was evidence that the South Congress Café property was subject to a variance dating back to the 1990s that permitted the operation of a restaurant without providing parking and that Trudy's was not required to file a site plan before remodeling the building.[2] Trudy's did, however, apply for and obtain the various City building permits required for it to remodel and open the restaurant. The permitting, remodeling, inspection, and certification process finally concluded in 2003, and the South Congress Café opened for business.

In early 2005, Trudy's began constructing the deck and other improvements over the gravel and dirt yard behind the existing building. The improvements included areas capable of being used for outdoor seating, a bar area with built-in margarita machines, new plumbing and electrical outlets, new lighting, landscaping, and fencing. Trudy's did not file or obtain approval of a site plan before beginning construction, nor did it obtain building permits beforehand. Trudy's presented summary-judgment evidence to the effect that a City inspector had orally assured it, while it was remodeling and permitting the restaurant building, that no additional approvals would be necessary for Trudy's planned improvements behind the building.

---

[2] The City references additional details regarding Trudy's initial development of the building, citing as support an exhibit to its summary-judgment motion containing Trudy's filings with the City prior to the remodeling. However, this exhibit, along with several others attached to the City's motion, were excluded by the district court on evidentiary grounds, including lack of authentication. The City has not appealed or raised a cross-point complaining of the district court's evidentiary rulings. Consequently, in our above summary of the summary-judgment evidence, we do not rely on the City's excluded summary-judgment evidence.

6

In a letter dated March 11, 2005, a City inspector notified Trudy's that it had violated the City Code by constructing its deck and surrounding fencing without obtaining approval of a site plan. The City accuses Trudy's of defying two previous stop-work orders issued by City inspectors, but Trudy's presented summary-judgment evidence that it did not receive notice of any perceived violations until it received the City's March 11 letter. Subsequently, on April 15, 2005, the inspector wrote Trudy's advising that a "follow-up" inspection had revealed that "the violations have not been corrected" and threatened criminal charges—with possible penalties up to $2,000 per day, per violation—if Trudy's did not correct them. *See id.* § 1-1-99 (making violation of zoning ordinances a Class C misdemeanor offense punishable by a fine not to exceed $2,000), § 25-1-462 (providing that a separate offense is committed for each day the violation occurs). At some point, the record reflects, Trudy's opened its deck to customers.

The City filed criminal charges against Trudy's. The case went to trial in September 2006. A jury found Trudy's guilty of intentionally developing or changing the use of property without having first obtained a site plan that had been approved and released by the City. However, it assessed punishment at a fine of only one dollar, the minimum permitted by the City Code and jury charge.

The City also filed a civil lawsuit against Trudy's in September 2005. The City sought declarations under the Uniform Declaratory Judgments Act[3] that Trudy's had violated the City Code by failing to obtain required City permits and approvals for its improvements and had

---

[3] *See* Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008).

7

no right to use the improvements until it secured the approvals. In particular, the City alleged that Trudy's had failed to secure, before constructing the improvements, a City-approved site plan or building, plumbing, and electrical permits; had failed to obtain required building permit inspections; and had constructed fencing, landscaping, a sidewalk, and pedestrian walkway on City right-of-way without securing a right-of-way construction permit or license agreement from the City.

The City also sought injunctive relief. Specifically, the City sought a temporary restraining order and temporary injunctive relief restraining Trudy's from using its improvements and requiring Trudy's to obtain all necessary City permits, approvals, and inspections, including site plans and certificates of occupancy, before Trudy's could resume using them. It further requested permanent injunctive relief requiring Trudy's to tear down the improvement if it could not obtain the required approvals and permits within 120 days after the date of judgment.[4]

The injunctive remedies sought by the City thus contemplated that Trudy's might be able to cure any City Code violations by obtaining any required City approvals or permits after-the-fact. In fact, Trudy's presented summary-judgment evidence—the testimony of George Zapalac, the City's development services manager—that it is fairly commonplace or routine, occurring as often as ten or fifteen times per year, for the City to grant the required approvals and permits retroactively in instances when property owners have violated the City Code by constructing improvements without obtaining the approvals in advance.

---

[4] The City also asserted—and ultimately obtained summary judgment on—claims relating to a dispute over Trudy's use of leased space on an adjacent property, 1602 Congress. This portion of the district court's judgment is not at issue on appeal.

8

The City obtained a hearing on its TRO request for September 29, 2005. Prior to the hearing, the parties agreed to execute a Rule 11 agreement in lieu of a TRO or temporary injunction. In that agreement, Trudy's committed that effective at midnight on October 4, 2005, it would stop using the deck except for employee ingress and egress until it obtained all required City permits, approvals, and inspections. Trudy's also agreed that if it violated this restriction, it would pay the City $1,500 per day for such violations. The City agreed that Trudy's would have the opportunity to cure its violations by seeking the required approvals and permits retroactively. The parties further agreed to a timetable for Trudy's to bring its improvements into compliance with the City Code,[5]

_____

[5] Paragraph five of the agreement stated:

   (5)    The Defendant agrees to the following deadlines for the applications, permits, inspections, and approvals:

          (a)    By November 3, 2005 (30 days from October 4, 2005), the Defendant agrees to file all necessary site plan applications, including requests for variances, if necessary, and building permits, if applicable, for the unapproved development at 1600 South Congress, including the deck, bar, and landscaping area . . . and any necessary offsite development, including parking.

          (b)    The Restrained Party will diligently work to obtain the City's approval within 60 days from submitting the application(s) referred to in the preceding paragraph for all site plan submissions. The Defendant is responsible for submitting all necessary information for a complete application. Requests for postponements of board or commission hearings shall be construed as diligently working toward obtaining city approval; however, any postponements requested do not extend the ultimate deadline for the Defendant to have secured all required City approvals, permits, agreement, or inspections by June 2, 2006.

          (c)    Within 30 days from the date of the City's approvals or the submitted site plan applications, the Defendant shall apply for all remaining

9

with a deadline of June 2, 2006 by which each of "the required approvals, permits, agreement, or inspections" were to be "substantially complete." Trudy's agreed that "[t]he City will make the determination of what is 'substantially complete,' not the Defendant." If these steps were determined not to be "substantially complete" by June 2, 2006, Trudy's agreed "to remove the

<div style="margin-left: 2em;">

necessary permits, approvals and licenses from the City, including but not limited to building, technical (electric, plumbing, mechanical), construction in right of way, and right of way license agreements.

(d)    Defendant must diligently work to secure all remaining City approvals within 30 days after submittal of the remaining permits, approvals and licenses; however, if the remaining approvals are not secured within 30 days after submittal, the delay involved does not extend the ultimate deadline for the Defendant to have secured all required City approvals, permits, agreement, or inspections by June 2, 2006.

(e)    Within 90 days from the date of the City's approvals on the submitted site plan applications and remaining permits, approvals and licenses, the Defendant must complete the construction of all site plan improvements, all structures, all construction in the right-of-way, and all technical improvements and pass all required City inspections.

(f)    In the event any of the required approvals, permits, agreement, or inspections are not substantially complete by June 2, 2006, the Defendant agrees to remove the structure(s), landscaping, deck, fence, bar, building(s), if applicable, plumbing, electrical work, mechanical work, or other improvement that has not been approved by that time. . . . The City will make the determination of what is "substantially complete," not the Defendant.

</div>

Paragraph 6 of the agreement set forth a non-exclusive list of permits and approvals that Trudy's was to obtain, including "site plan application (including parking requirements);" "zoning or rezoning requests, if necessary;" "all building permits, including building, plumbing, electric, mechanical, and landscaping;" "all parking requirements or variances thereof;" licenses and permits for Trudy's construction on City right-of-way; and health department, water utility, and Texas Alcoholic Beverage Commission approvals.

structure(s), landscaping, deck, fence, bar, building(s), if applicable, plumbing, electrical work, mechanical work, or other improvement that has not been approved by that time."

In turn, the City agreed in paragraph 7 of the agreement to "reasonably work with [Trudy's] to come into compliance with the City Code development regulations and meet all the application deadlines [specified] above." Finally, in the concluding paragraph of the agreement, it was agreed that "[i]n the event that the Defendant violates the terms of this agreement, the City may go to district court and seek any and all remedies available to it under this agreement, at law, or in equity."

Trudy's filed a site plan application on September 15, 2005. Among other issues, it attempted to address a City Code requirement that it provide twenty-two parking spaces, plus one handicapped space; this requirement, in the City's view, had been triggered by the square footage that Trudy's had added in its deck. *See id.* §§ 25-6-472(E) (outdoor seating areas of restaurants generally included in gross floor area from which parking spaces requirement is calculated). The Code authorizes the director of the City's Watershed Protection and Development Review Department (which, Trudy's evidence reflects, is typically delegated to lower-level staff who are reviewing each site plan application) to approve, "[a]s part of the site plan review process, . . . the location of all or a portion of the required parking . . . for a use on a site other than the one on which the use is located" under certain conditions. *See id.* §§ 25-6-501. A person requesting to use an off-site parking facility is required to make application to the director, including submitting proof of leases or other rights to use the proposed location, and the director (or delegee) "may consider" various factors in deciding whether to grant the application. *See id.* §§ 25-6-502. However, the

11

director's (or delegee's) discretion to allow an applicant to furnish required parking off-site is limited by the following provision:

> A required parking space for persons with disabilities may not be located in an off-site parking facility unless the director determines that existing conditions preclude on-site parking.

*See id.* §§ 25-6-501(E).

In its September 2005 site plan application, Trudy's informed reviewers that its improvements detailed therein had already been constructed. Consistent with the position that its improvements were an "existing condition" that "precludes on-site parking" under section 25-6-501(E), Trudy's application proposed to provide the required parking spaces—including the one handicapped space—off-site on a lot owned by the Congress Avenue Baptist Church at 1601 South Congress, across Congress from South Congress Café. While the site plan was under review, Trudy's also requested a variance from the Board of Adjustment exempting it from the additional parking requirement. The variance was ultimately denied in February 2006 and reconsideration was denied in March.

The City issued comments on Trudy's site plan on October 24, 2005. The City indicated agreement with Trudy's position that it was permitted to provide the required parking—including the handicapped space—off-site. City reviewers instructed that Trudy's must "[p]rovide handicapped accessible space on-site *or at nearest off-site location*" (emphasis added), and even made demands related to the particular off-site parking location Trudy's had proposed. The City required Trudy's to provide a copy of its lease with the church and cautioned that off-site

12

parking must be paved with asphalt, concrete, or other hard durable surface. After ascertaining that the City did not consider the church lot to be "paved," Trudy's began negotiating a lease for off-site parking at another location, Hudson's Meat Market, located at 1800 S. Congress. On March 9, 2006, Trudy's filed an updated site plan proposing that the required parking spaces—including the handicapped space—be located off-site at Hudson's.

As the City Code's 180-day deadline for site plan approval was approaching, Trudy's requested and obtained a 60-day extension. Around the same time, on March 27, 2006, the City provided Trudy's its comments on the amended site plan (a few days after its deadline to do so). Regarding parking, the City again advised that Trudy's must "[p]rovide handicapped-accessible space on-site *or at nearest off-site parking location*." Further reflecting the view that off-site handicapped parking was permitted, the City also imposed several new requirements regarding the off-site parking, including a "parking table . . . showing the amount and provided parking for the primary use and the use where the off-site parking is located," a "site plan note indicating days and hours of operation for the proposed use and the uses from which the spaces are being leased," and pedestrian curb ramps at the east and west intersections of Monroe and South Congress.

Meanwhile, the Bouldin Creek Neighborhood Association—an organization comprised of property owners and renters in the nearby residential neighborhood which had ongoing concerns with South Congress developments it perceived would increase parking demand on residential streets—expressed concerns to the City that parking access problems in Hudson's lot would arise during deer season, when Hudson's (which processes meat in addition to selling it) kept hours into the evenings and would thus overlap with the South Congress Café's evening clientele.

13

These complaints prompted the City—still proceeding in the view that off-site handicapped parking was permitted—to require Trudy's to execute a restrictive covenant preventing it from using the deck when the parking lot at Hudson's was unavailable. Trudy's agreed to do so. On May 6, Trudy's filed another updated site plan. The record contains additional evidence of back-and-forth communications between the City and Trudy's concerning details of its parking lease and the restrictive covenant, all consistent with the shared understanding that Trudy's already-constructed improvements were "existing conditions" that precluded on-site handicapped parking. Trudy's also presented summary-judgment evidence that City planners involved in reviewing Trudy's site plans had, in fact, internally determined that Trudy's improvements were an "existing condition" that precluded on-site handicapped parking for purposes of section 25-6-501(E). Amy Link, one of the transportation planners involved in the review process, further acknowledged that the City had conveyed this position to Trudy's in its site plan comments.

On May 17, 2006, the City approved Trudy's amended site plan and issued the site development permit. However, the City did not *release* the plan, the remaining necessary step before Trudy's could obtain a building permit and proceed with the other steps in the approval process. *See id.* § 25-5-43. On May 24 (again a few days after its deadline), the City provided comments on Trudy's most recent updated site plan. Comments again included the requirement that Trudy's "[p]rovide handicapped accessible space on-site *or at nearest off-site parking location*" (emphasis added), as well as requiring Trudy's to record the restrictive covenant. Trudy's subsequently filed its executed restrictive covenant and recorded it, as the City had required.

14

However, Trudy's remained in limbo, awaiting release of its site plan, as the Rule 11's June 2, 2006 deadline expired.

On July 11, 2006—over a month after the June 2 deadline expired—Victoria Hsu, the City's director of its Watershed Protection and Development Review Department, wrote Trudy's counsel advising that Trudy's site plan application "does not comply with City Code requirements and, therefore, has been denied." Hsu elaborated:

> On May 17, 2006, the City of Austin approved the application for the above-referenced site plan. Prior to release of the site plan, the City determined that the site plan application was approved in error because it does not meet City requirements for handicapped parking. Section 25-6-501(E) states that "[a] required parking space for persons with disabilities may not be located in an off-site parking facility unless the director determines that existing conditions preclude on-site parking." [Your] Site Plan . . . does not show any on-site parking for persons with disabilities. The only accessible space is located off-site, two blocks away from the restaurant. Providing an accessible space on-site would require the removal of a portion of the existing deck. However, since the deck was built without the required permits, it cannot be considered an existing condition that precludes on-site parking.
>
> Therefore, because the site plan does not comply with all applicable requirements of the City Code, the prior approval of [Trudy's site plan] is rescinded.

In Hsu's letter, in other words, the City took the position for the first time that Trudy's already-constructed improvements could not be "existing conditions [that] preclude on-site parking" under City Code section 25-6-501(E) because they had been built without obtaining prior City approvals. This meant that Trudy's was required to provide the handicapped space on-site, which it could not do without demolishing some or all of its improvements, which covered the entire back portion of its lot. It also meant that Trudy's months of pursuing off-site parking leases, restrictive covenants, and other efforts to satisfy City demands relating to handicapped parking—not to mention the

15

expenses it had incurred in the process—had been, in the City's new view, an exercise in futility from its inception. Trudy's presented summary-judgment evidence that it incurred $179,000 in expenses in pursuing off-site handicapped parking and trying to satisfy the City's evolving requirements and demands related to it.

The City's stance regarding off-site handicapped parking advocated in Hsu's letter was a complete reversal of the position it had maintained—and repeatedly communicated to Trudy's—prior to that time. Trudy's presented evidence that the City's change in position responded to an intense lobbying campaign—targeting City officials from the site plan reviewers up to the then-City Manager and City Council—spearheaded by a City Hall lobbyist hired by another South Congress business, Allen's Boots, in coordination with members of the Bouldin Creek Neighborhood Association. In fact, there was evidence that the rationale that Hsu and the City advanced to justify its reversal—Trudy's already-constructed improvements could not be "existing conditions [that] preclude on-site parking" for purposes of City Code section 25-6-501(E) because they had been built without obtaining prior City approvals—was originally devised by the Allen's Boots lobbyist. Further, while the City extolls its actions as a triumph for public participation in the land development process, Trudy's presented proof (and it appears undisputed) that the City afforded Trudy's no opportunity to be heard and respond to the arguments its adversaries were raising before abruptly reversing course and adopting those arguments.

Trudy's also presented evidence that the City's "rescission" of Trudy's already-approved site plan was unusual and unprecedented. Zapalac, the City's development services manager, who had earned the moniker of City development "guru," testified that he was unaware

16

of the City ever having previously "rescinded" an approved site plan. In fact, as Trudy's points out, the City Code contains no provision authorizing the City to "rescind" an approved site plan; it speaks only to disapproving a site plan application, *see id.* § 25-5-112(B), or revoking a released site plan after first suspending it and affording the person notice and an opportunity to cure the problem. *See id.* §§ 25-1-412, 25-1-416 through -418. Additionally, while the City Code provides an administrative appeal for persons aggrieved by site plan disapprovals or revocations, *see id.* §§ 25-1-461, 25-5-112(C), there is, of course, no appeal procedure explicitly provided for "rescissions" of approved site plans, as the Code does not contain a "rescission" procedure. Trudy's nonetheless filed an administrative appeal of the City's "rescission" of its site plan shortly after that decision. Almost three months later, on October 4, 2006, Hsu wrote Trudy's asserting that neither the Code provisions governing site plan "suspensions" nor those governing site plan "disapprovals" applied and that Trudy's site plan "rescission" was instead an unappealable "denial" because the deadline for Trudy's to file updates had expired two days after the City's abortive approval of the site plan.

Contending that Trudy's had failed to "substantially complete" the approval and permitting process by June 2, 2006, as required by the Rule 11 agreement, the City resumed its litigation against Trudy's. The City amended its petition to add allegations that Trudy's had violated the Rule 11 agreement by not obtaining a site plan and not filing applications for the other required permits and approvals. Trudy's counterclaimed, alleging that the City had breached its obligation under the Rule 11 agreement to "reasonably work with" Trudy's and violated Trudy's rights to Due Process and Equal Protection. Trudy's further sought declarations that it had not materially breached the Rule 11 agreement or that any such breach was excused by the City's prior material

17

breach, that it had "substantially completed" its obligations under the Rule 11 agreement, and that the City's claims were barred by the absence of a condition precedent—the Rule 11 provision that the City could pursue its legal and equitable remedies if Trudy's breached the agreement. Trudy's also asserted affirmative defenses of equitable estoppel, excuse by the City's prior material breach, and failure to satisfy condition precedent.

The City subsequently filed a motion for summary judgment under the "traditional" standard. Following a hearing, the district court signed an order granting the motion, granting the City's requests for declaratory and permanent injunctive relief, and denying relief on all of Trudy's counterclaims. Thereafter, the City filed a motion seeking attorney's fees of $242,399 plus costs under the UDJA. Following a hearing, the district court rendered final judgment declaring that Trudy's "has no right to use the deck, bar, fence, concrete improvements in the City's right-of-way, and all appurtenances constructed without City approvals in or about February 2005 . . . until it secures the necessary permits and approvals for the intended use;" ordering that Trudy's apply for demolition permits within one day and remove the improvements within thirty days; and enjoining Trudy's against reconstructing the improvements until its obtained all required City approvals and permits. However, it rejected the City's attorney's fee claim, concluding that it was not "equitable and just" to award the City any attorney's fees or costs. The district court conditionally suspended enforcement of the judgment pending appeal. This appeal followed.

**ANALYSIS**

Trudy's challenges the judgment through four issues on appeal. First, it asserts that the district court erred in granting summary judgment as to its equitable estoppel defense. Second,

18

Trudy's contends that the summary-judgment evidence raised genuine issues of material fact as to whether the City satisfied conditions precedent the Rule 11 agreement imposed before it could renew litigation against Trudy's. Relatedly, in its third issue, Trudy's argues that the evidence raises fact issues as to whether the City had breached its duty to "reasonably work with" Trudy's (which goes to both Trudy's affirmative defenses and its breach-of-contract counterclaim). Finally, in its fourth issue, Trudy's urges that the district court erroneously granted the City more relief than it sought in its summary-judgment motion.

**Standard of review**

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.

A movant seeking traditional summary judgment on its own cause of action—as the City did—has the initial burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its cause of action. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam) (citing *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999); *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 927 (Tex. 1996). Similarly, if a movant seeks traditional summary judgment against another

party's cause of action, as the City also did, it must conclusively negate at least one element of that cause of action. *Little v. Texas Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). If the movant meets this burden, the burden shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *See id.* If the party opposing summary judgment relies on an affirmative defense, as Trudy's did, it must present evidence sufficient to raise a fact issue on each element of the affirmative defense. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).

**Equitable estoppel**

In its first issue, Trudy's argues that the district court erred in determining that the summary-judgment evidence did not raise a fact issue as to each element of Trudy's affirmative defense of equitable estoppel. "Equitable estoppel is based on the principle that 'one who by his conduct has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss and injury to the other.'" *City of Fredricksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.) (quoting *Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 367 (Tex. App.—Texarkana 2002, pet. denied)). The elements of equitable estoppel are: "(1) a false representation or concealment of material facts; (2) is made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of those facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998). Summarizing its equitable-estoppel theory, Trudy's asserts that "even assuming the City acted entirely innocently (an assertion which is subject to question and would be attacked at trial), the City has (1) induced Trudy's to play its game by entering

20

into a Rule 11 Agreement" contemplating that Trudy's could obtain approval by providing the required handicapped parking off-site, "(2) purposefully tangled Trudy's in its web of bureaucratic processes, (3) lured Trudy's further along with instructions to obtain the required parking 'on-site or at the nearest off-site' location, followed by its express approval of Trudy's off-site plan, and then (4) suddenly reneged on the entire agreement, leaving Trudy's holding the bag of expenses incurred along the way." Under these circumstances, Trudy's urges, the City is estopped from changing its position and requiring Trudy's to provide the handicapped parking on-site.

In response, the City relies primarily upon the general rule that a municipality cannot be estopped in the exercise of its governmental functions. *See City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 773 (Tex. 2006); *see also id.* at 773 n.2 (emphasizing that the rule does not apply to a municipality's performance of proprietary functions).[6] The rationales for this rule are similar to those that underlie sovereign and governmental immunity. *See id.* at 773 ("In general, the rule derives from our structure of government, in which the interest of the individual must at times yield to the public interest and in which the responsibility for public policy must rest on decisions officially authorized by the government's representatives, rather than on mistakes committed by its agents.") (citing *City of San Antonio v. Deutsch*, 91 S.W.2d 308, 310 (Tex. 1936) ("The city's public or governmental business must go forward, unimpeded by the fault, negligence, or frailty of those charged with its administration.")); *id.* ("[B]arring estoppel helps preserve separation of powers; legislative prerogative would be undermined if a government agent

---

[6] There is no dispute that the City functions Trudy seeks to estop are "governmental" functions.

21

could—through mistake, neglect, on an intentional act—effectively repeal a law by ignoring, misrepresenting, or misinterpreting a duly enacted statute or regulation."); *id.* at 774 (citing concern with potentially "unlimited liability" for the government); *Deutsch*, 91 S.W.2d at 310 (comparing estoppel of government to the imposition of negligence liability); *cf. City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009) (acknowledging that suits to control state action—i.e., those that "seek to alter government policy"—implicate sovereign immunity, while ultra vires suits that seek to "enforce existing policy" and laws generally do not); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331-32 (Tex. 2006) (sovereign immunity "remains firmly established, and as it has come to be applied to the various governmental entities in this State, an important purpose is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments."). A central pillar of both of these common-law doctrines is thus the notion that individual citizens who interact with their government must generally bear, as far as legal remedies are concerned, a certain level of risk or harm from governmental "improvident actions"—a delicate term for the array of human frailties citizens may encounter when dealing with government personnel—because "individual interests" must be sacrificed in the name of the "public interest" that governmental actions ostensibly embody. *See Super Wash*, 198 S.W.3d at 773-74; *Tooke*, 197 S.W.3d at 331-32.

However, Texas courts have long recognized an equitable exception to the anti-estoppel rule: a municipality may be estopped where (1) "justice requires its application" and (2) "there is no interference with the exercise of its governmental functions." *Super Wash, Inc.*, 198 S.W.3d at 774. Whether this exception applies is a question of law for the court. *Id.*

Trudy's urges that this case is one in which "justice requires" that the City be estopped from disputing that Trudy's already-constructed improvements are an "existing condition" for purposes of section 25-6-501(E) and requiring Trudy's to furnish handicapped parking on-site. It condemns the City's sudden reversal in its application of section 25-6-501(E) as "nonsensical, unsupported, and statutorily illogical" and emphasizes its evidence that the City abruptly devised the rescission procedure and rationale in response to political pressure. Prior to the City's reversal, Trudy's further stresses, the City induced it to expend $179,000 in pursuit of off-site handicapped parking, then "yanked the rug out" from under it by deciding that off-site handicapped parking was not an option after all.

In *Super Wash*, the Texas Supreme Court had occasion to revisit the equitable exception permitting estoppel against municipalities and to clarify how courts should distinguish cases where "justice requires" estoppel from what the common law regards as ordinary costs of doing business with the government. The supreme court stressed that the exception is available "only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice." *Id.* It further pointed out that it has held "justice requires" estoppel against a municipality in only two cases. In both cases, the court observed, there was evidence that city officials may have affirmatively misled individuals regarding a notice-of-claim requirement and that these actions resulted in the permanent loss of their claims against the cities. *See Roberts v. Haltom City*, 543 S.W.2d 75, 80 (Tex. 1976); *City of San Antonio v. Schautteet*, 706 S.W.2d 103, 105 (Tex. 1986). In *Super Wash*, the supreme court cited *Roberts* and *Schautteet* to "illustrate the types of cases that may fall under the 'justice requires' exception." *Super Wash*, 198 S.W.3d

23

at 775. The court elaborated that those cases, as well as a case of this Court that it cited with approval—*City of Austin v. Garza*, 124 S.W.3d 867, 875 (Tex. App.—Austin 2003, no pet.) (City received direct donation of land in exchange for land subject to an erroneous plat note could later be estopped from denying the validity of the plat note)—stood for the proposition that "[e]vidence that city officials acted deliberately to induce a party to act in a way that benefitted the city but prejudiced the party weighs in favor of applying the exception." *Super Wash*, 198 S.W.3d at 775. The court also emphasized that "the complaining parties in *Roberts* and *Schautteet* would have been completely denied relief had the cities not been estopped, because only an equitable remedy could revive their otherwise extinguished claims." *Id.*

The *Super Wash* court further expounded on the circumstances in which "justice requires" estoppel when analyzing the facts presented in that case. A property owner (Super Wash) had begun construction of a car wash in reliance on a building permit issued by the City of White Settlement and was later advised by the city that the permit was erroneous because it conflicted with a zoning ordinance. Unbeknownst to Super Wash when it purchased the property and obtained the permit, the property had originally been zoned residential but was subsequently zoned commercial conditioned on the occupant constructing and maintaining a privacy fence along the property's boundary at Longfield Drive, which separated the property from a residential area. Super Wash submitted a site plan proposing a curb cut and exit onto Longfield and no privacy fence. Apparently overlooking the zoning ordinance requiring the privacy fence, city officials approved the site plan and issued Super Wash a building permit on February 8, 2001. Four days later, on February 12, after complaints from area residents, the City informed Super Wash that it would need

24

to provide a privacy fence along Longfield Drive. Subsequently, on March 1, after construction was forty-five percent complete, the city advised Super Wash that it was required to remove its planned exit onto Longfield based on the city's interpretation that the zoning ordinance required a continuous fence. *See id.* at 772. Super Wash sought to "estop the city from enforcing the fence ordinance so it can build a second entrance/exit to assist with traffic flow." *Id.* at 775.

On these facts, the supreme court held that justice did not require that the city be estopped from enforcing the zoning ordinance. It identified and balanced several factors in making that determination.[7] The court first distinguished the facts of the case from those in *Roberts* and *Schautteet*, where the parties seeking estoppel would have been "*completely* denied relief had estoppel not applied." *See id.* (emphasis in original). By contrast, according to the *Super Wash* court, Super Wash "has been operating for years without this second entrance/exit, and there is nothing in the record to indicate that it is necessary for its continued operation." *See id.* The supreme court added that "there are other remedies available to Super Wash—such as seeking a variance or a repeal of the Ordinance—that it has yet to pursue." *Id.* The court then emphasized that "[j]ustice may require estoppel if it is the only available remedy; conversely, the existence of alternative remedies weighs strongly against the doctrine." *Id.*

The supreme court also drew upon *Roberts*, *Schautteet*, and *Garza* in considering whether the city had benefitted from issuing the permit. It rejected Super Wash's argument that the city had benefitted from its actions by adding a commercial business to its tax base. Contrasting this

---

[7] Our discussion of these factors draws upon both *Super Wash* and the analysis in Nicholas G. Grimmer, *Comment: Oops! It Turns Out You Shouldn't Have Built That There: Erroneously Issued Building Permits in Texas*, 44 Hous. L. Rev. 1415, 1427-31 (2008).

benefit with *Garza*'s "large, direct donation of land" that the city received "in exchange for land that was subject to an erroneous plat note," the court dismissed it as "too attenuated to establish grounds for equitable relief." *Id.* at 775-76.

The supreme court also appeared to consider the reasonableness of Super Wash's reliance on the permit and the extent to which it had been in a position to avoid its plight. It emphasized that "while it is true the City issued the building permit in error, the Ordinance was a matter of public record and discoverable by Super Wash before it purchased the lot." *Id.* at 775. It added that Super Wash was charged with constructive notice of the ordinance, citing an earlier case for the proposition that a "party seeking to estop city's enforcement of zoning ordinance charged with constructive knowledge of the ordinance and could therefore not rely on building permit issued by city in violation of the law." *Id.* (citing *Davis v. City of Abilene*, 250 S.W.2d 685, 688 (Tex. Civ. App.—Eastland 1952, writ ref'd)). Earlier in its opinion, the *Super Wash* court had similarly contrasted *Roberts* and *Schautteet* with prior decisions in which it had held that unauthorized acts of city government officials generally could not estop a municipality's enforcement of its zoning ordinances. *See id.* at 773. As an example, it cited *Hutchins v. Prasifka*, 450 S.W.2d 829 (Tex. 1970), in which the court held that a city was not estopped against enforcing its zoning laws where a landowner had relied on a zoning map that a city employee had erroneously changed based on a planning commission resolution that did not have the legal effect of changing the zoning ordinance. *See Super Wash*, 198 S.W.3d at 774 (citing *Prasifka*, 450 S.W.2d at 833-36).

Finally, the supreme court also seemed to consider the actions of the city in rectifying the situation. It emphasized that "the City acted quickly—within [4] days of learning of its error—to

26

notify Super Wash of the Ordinance." *Id.* at 775. The court contrasted an earlier case involving a city's failure to enforce a law for twenty years. *Id.* (citing *Krause v. City of El Paso*, 106 S.W. 121, 124 (Tex. 1907)).

Perhaps significantly, the *Super Wash* court did not explicitly consider whether Super Wash had incurred any economic harm short of that which would have required it to shut down. *See id.* ("The business has been operating for years without this second entrance/exit, and there is nothing in the record to indicate that it is necessary for its continued operation."). We note that Super Wash learned of the ordinance and the city's interpretation that it required a continuous fence (and thus no second entrance/exit) while construction was still underway and that Super Wash was able to complete construction without the exit. *See id.* at 772. There is no indication that Super Wash had to tear down or re-do construction it had already completed, nor did it attempt to estop the city from requiring it to do so. Rather, only after completing construction did Super Wash seek to invoke estoppel to permit it to construct the second entrance/exit in the future. *See id.* at 775. *Super Wash* is thus not a case where a landowner has completed construction in reliance on a permit, then is told the permit is invalid and that it would be forced to "undo" its previous improvements. Several of our sister courts (albeit prior to *Super Wash*) have held that municipalities are estopped to enforce ordinances that would have barred and required "undoing" of already-completed improvements made in reliance on permits that municipalities issue and later claim are erroneous. *See Bopp*, 126 S.W.3d at 220-24 (property owner constructed sign in reliance on erroneously issued permit); *Maguire Oil Co.*, 69 S.W.3d at 368 (justice required that city be estopped against enforcing restrictions after oil company spent $190,000 preparing a drill site

27

in reliance on city permits); *see also Hooters, Inc. v. City of Texarkana*, 897 F. Supp. 946, 954-55 (E.D. Tex. 1995) (municipality estopped; emphasizing that plaintiff spent almost $100,000 in reliance on permit).

On the other hand, *Super Wash* acknowledges that construction at the site was "forty-five percent complete" before the city informed Super Wash that it could not instruct the second entrance/exit. *See Super Wash*, 198 S.W.3d at 772. Presumably, Super Wash incurred *some* expenses prior to that time related to the second entrance/exit and having to eliminate it, yet the supreme court never mentions these in its analysis. Whether this is because the court deemed it unreasonable for Super Wash to begin constructing the second entrance while having actual and constructive knowledge of the ordinance, because the court considered these expenses negligible or Super Wash failed to prove them, or because the court considered these expenses irrelevant if they did not rise a level that would shut down the business, or some combination of these reasons, is unclear.

We now apply these factors to the summary-judgment record here. Trudy's estoppel theory is predicated on the City's repeated representations and assurances that Trudy's could bring its improvements into compliance with City parking requirements by providing handicapped parking off-site. There is simply no evidence that the City directly benefitted in any way from inducing Trudy's to pursue off-site parking. *See Super Wash*, 198 S.W.3d at 775-76; *cf. Roberts*, 543 S.W.2d at 80; *Schautteet*, 706 S.W.2d at 105; *Garza*, 124 S.W.3d at 875. Although Trudy's presents summary-judgment evidence that it incurred an aggregate of $179,000 in expenses in pursuing off-site parking in reliance on the City's representations and assurances, it does not identify

28

any portion of this amount that it paid to the City or otherwise demonstrate any material benefit the City received from those expenditures. And if anything, the record supports an inference that the City did not benefit from inducing Trudy's to pursue off-site handicapped parking—the City wasted considerable employee time, money, and other municipal resources in connection with Trudy's efforts.

Nor does the summary-judgment evidence support any reasonable inference that the City's representations and assurances were deliberately calculated to mislead Trudy's to some end. *See Super Wash*, 198 S.W.3d at 774-75; *cf. Roberts*, 543 S.W.2d at 80; *Schautteet*, 706 S.W.2d at 105. The evidence instead reflects that for almost eight months the City had decided to apply section 25-6-501(E) in a manner that would have permitted Trudy's to provide handicapped parking off-site, then suddenly changed course and decided to do the exact opposite. Whatever one might think of the City's reversal or the circumstances surrounding it, these facts alone do not support a reasonable inference that the City had been acting deliberately to mislead Trudy's during the months prior to that time.

As for whether estoppel is Trudy's "only available remedy" as contemplated in *Super Wash*, *see* 198 S.W.3d at 775, Trudy's urges that estopping the City from requiring on-site handicapped parking is the only means at this juncture by which Trudy's could avoid having to demolish its deck for failure to comply with the City Code. The summary-judgment evidence indeed supports such an inference,[8] but that does not mean that this critical element of the *Super Wash*

---

[8] As noted, the City's Board of Adjustments has already denied Trudy's request for a variance from the parking requirements. *Cf. City of White Settlement v. Super Wash, Inc.*, 198 S.W.3d 770, 775 (Tex. 2006) ("there are other remedies available to Super Wash—such as

29

analysis weighs in estoppel's favor here. In this equitable analysis, we cannot overlook the role of Trudy's own conduct that contributed to the situation in which it now finds itself. *See id.* at 775. Whatever one might think of the City's subsequent conduct, it remains undisputed that Trudy's constructed its deck and other improvements without first obtaining City approvals and permits, as the City Code requires. Although Trudy's presented evidence that it was misinformed by a City employee and misunderstood (at least initially) that no such approvals would be required before constructing the deck, it does not contend that the City is estopped from enforcing the Code against it for this reason. Having constructed its improvements in violation of the Code, Trudy's was, all other things being equal, subject to City enforcement measures including, and not limited to, forcing Trudy's to demolish the improvements. *See* Tex. Local Gov't Code Ann. § 211.012(c) (West 2008). That situation—a product of Trudy's own actions—provides the context in which we must consider whether "justice requires" estoppel based on the City's actions.

Although the City Code contemplates that persons will obtain required property development approvals and permits prospectively, before beginning construction, *see* City Code §§ 25-1-61, 25-5-1, 25-11-32, 25-11-33, it is undisputed that the City has made a discretionary enforcement decision to permit persons who have made improvements without first obtaining the required approvals to seek and obtain them after-the-fact. With Trudy's, in fact, the City went even farther and bound itself contractually, through the Rule 11 agreement, to afford

seeking a variance or a repeal of the Ordinance—that it has yet to pursue."). There is also evidence that the same neighborhood opposition that influenced the City's sudden reversal on off-site handicapped parking also contributed to the denial of Trudy's variance request. We conclude this evidence raises a fact issue as to whether it would have been futile for Trudy's to seek legislative change to the parking ordinance. *Cf. id.*

30

Trudy's that opportunity. In implementing this discretionary de facto retroactive permitting regime, the City, in turn, necessarily had to make a number of discretionary decisions as to how it applied Code requirements that were intended to govern planned future improvements retroactively to improvements that had already been completed. These included whether or how the City would replicate section 25-6-501(E) requirements with respect to already-completed but un-permitted improvements. Would the improvements be considered an "existing condition" precluding on-site handicapped parking because it was already built by the time the City began applying the ordinance retroactively? Or, should the director consider the state of the property at the time the owner should have obtained the required approvals, before construction of the improvement began? The City initially opted for the former approach, which would have allowed Trudy's to provide handicapped parking off-site, assured and encouraged Trudy's to pursue that option for months, causing Trudy's to expend substantial sums, then reversed its position even after having approved Trudy's site plan. While financially damaging to Trudy's, the ultimate effect of the City's actions was to return Trudy's improvements to the same legal status they were in before Trudy's began seeking retroactive approval—they were vulnerable to a City enforcement action forcing Trudy's to demolish them. That underlying plight, again, was Trudy's own doing.

We also observe that Trudy's does not complain that the City's actions in inducing it to pursue off-site parking caused it to forego other alternatives for curing its Code violations. Instead, Trudy's complains that the City's reversal on off-site parking deprived it of its only remaining chance to cure its violations and save its improvements. The fact that it even had the chance to cure its violations, again, was entirely a function of the City's discretionary exercise of

31

its enforcement powers, and the underlying violations were attributable to Trudy's alone. Additionally, following *Super Wash*'s guidance, we must consider that Trudy's presented no evidence that the survival of the South Congress Café depended upon preserving the improvements behind the restaurant. *See Super Wash*, 198 S.W.3d at 775. In sum, we cannot conclude that the summary-judgment evidence raises issues as to facts that would cause the "only available remedy" factor to weigh in favor of Trudy's.

On the other hand, other *Super Wash* factors do weigh in Trudy's favor. As for whether it was reasonable to rely on the City's initial application of section 25-6-501(E), *see id.*, we disagree with the City's characterization of its sudden reversal as its correction of a "mistake of law" by a staffer. This is not a case like *Super Wash*, where both the city and Super Wash overlooked a zoning ordinance, a matter of public record with which Super Wash was charged with constructive knowledge. *See id.* Instead, as previously suggested, the City actions here impacted discretionary enforcement decisions, specifically, how the City administers a de facto retroactive permitting regime found nowhere in the City Code itself. Rather than reflecting the City's principled application of established legal requirements, the summary-judgment record, viewed in Trudy's favor, reflects that the City altered the rules as it went along and abruptly changed them in the face of political pressure. Furthermore, neither the City nor Trudy's overlooked section 25-6-501(E)—there is evidence that it was a central fixture of their common view for months that Trudy's could provide handicapped parking off-site. Instead, the City simply decided that section 25-6-501(E) would require one thing for eight months, then abruptly decided that it required something else. Trudy's

is not charged with constructive knowledge that the City would unpredictably change the rules in the waning minutes of the game.

Additionally, the City did not "act[] quickly" in rectifying the situation with Trudy's. *See id.* Drawing inferences in favor of Trudy's, the City induced Trudy's to labor for eight months in reliance on the City's then-decision that Trudy's could provide handicapped parking off-site. There is also evidence that, once that application of section 25-6-501(E) became an issue, the City delayed informing Trudy's for as much as six weeks, "running out the clock" on Trudy's June 2, 2006, deadline for complying with the Rule 11 agreement, then acted in a somewhat obstructionist, delaying manner when Trudy's attempted to bring an administrative appeal from the "rescission."

Finally, we consider the economic harm to Trudy's attributable to the City's actions. Trudy's emphasizes evidence that, relying on the City's representations and assurances, it spent $179,000 in pursuing the off-site parking, only to have the City renege on its representations. This is a considerable sum, in line with expenditures that *pre-Super Wash* court of appeals cases have held to justify estoppel. *Maguire Oil Co.*, 69 S.W.3d at 368 ($190,000 spent in reliance on city permit); *Hooters, Inc.*, 897 F. Supp. at 954-55 ($100,000 spent in reliance on permit). On the other hand, *Super Wash* is unclear, as previously discussed, as to what weight, if any, we should place on this factor.

Even if we consider Trudy's large expenditures to be a factor favoring estoppel, we ultimately cannot conclude that Trudy's has presented evidence of the sort of "exceptional case in which justice requires estoppel," as the Texas Supreme Court seems to view that threshold in *Super Wash*. Our conclusion is informed by the supreme court's strong emphasis on the "only

33

available remedy" factor, whether the municipality benefitted from the complained-of conduct, and whether the municipality deliberately misled the party seeking estoppel—all factors that weigh against estoppel here. *See Super Wash*, 198 S.W.3d at 774-75. This is not a case where, for example, the City misled or harmed an innocent party, left it with no other remedy, acted deliberately, or benefitted in some way. Consequently, the district court did not err in granting summary judgment as to Trudy's estoppel defense. We need not reach whether Trudy's raised a fact issue as to the second element of the exception to the anti-estoppel rule, whether estoppel would not interfere with a governmental function. *See Super Wash*, 198 S.W.3d at 776-78. We overrule Trudy's first issue.

**Rule 11 agreement**

In its second issue, Trudy's asserts that the summary-judgment evidence raises a fact issue as to whether its "required approvals, permits, agreement, or inspections [were] substantially complete by June 2, 2006," as required by the Rule 11 agreement. Trudy's emphasizes that before the City's sudden reversal on off-site handicapped parking, the City had approved its site plan with two weeks remaining before the Rule 11 deadline for Trudy's to obtain the other required approvals and inspections for its improvements. Trudy's presented summary-judgment evidence that it could have obtained the remaining required permits and inspections before the deadline if the City had not "rescinded" its approval and refused to release the site plan. Because fact issues remain as to whether it breached its obligation to "substantially complete" the approval process, Trudy's further reasons, the City did not establish its entitlement to summary judgment regarding another of Trudy's affirmative defenses—that the City did not satisfy a condition precedent

imposed by the Rule 11 agreement on its right to pursue its remedies against Trudy's. Trudy's points to the concluding sentence of the Rule 11 agreement: "In the event that the Defendant violates the terms of this agreement, the City may go to district court and seek any and all remedies available to it under this agreement, at law, or in equity." Reading this provision in context with the Rule 11 agreement as a whole, in Trudy's view, the City agreed to "stay" its litigation efforts and not to proceed unless Trudy's first "violate[d] the terms of this agreement."

Relatedly, in its third issue, Trudy's contends that the summary-judgment evidence raises a fact issue as to whether the City breached its duty under the Rule 11 agreement to "reasonably work with [Trudy's] to come into compliance with the City Code development regulations and meet all application deadlines" stated in the agreement. Evidence of this breach, Trudy's further contends, raises a fact issue as to both its breach-of-contract counterclaim and its affirmative defense that any failure on its part to "substantially complete" the permitting and approval process by June 2, 2006, was excused by the City's prior material breach of the agreement.

Rule 11 agreements are contracts relating to litigation, subject, therefore, to general rules of contract construction. *See Dallas County v. Rischon Dev. Corp.*, 242 S.W.3d 90, 93 (Tex. App.—Dallas 2007, pet. denied); *Disney v. Gollan*, 233 S.W.3d 591, 595 (Tex. App.—Dallas 2007, no pet.). Our primary objective in construing a written contract is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). Contract terms are given their plain, ordinary, and generally accepted meanings, and contracts are to be construed as a whole in an effort

to harmonize and give effect to all provisions of the contract. *Valence Operating Co.*, 164 S.W.3d at 662. If a contract can be given a certain or definite legal meaning or interpretation, it is not ambiguous and is construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

The Rule 11 agreement, as previously discussed, essentially replicated the effect of the temporary injunction the City was seeking to proscribe Trudy's use of its improvements. In return, the City bound itself to giving Trudy's approximately eight months to seek and obtain the required approvals and permits for its improvements retroactively in accordance with an agreed timeline.[9] The City further bound itself to "reasonably work with [Trudy's] to come into compliance with the City Code development regulations and meet all application deadlines" in the agreement. As the City points out, this provision did not require it necessarily to *approve* or *issue* permits if it turned out that Trudy's could not satisfy the applicable City Code requirements, and we do not understand Trudy's to be advancing such a contention. Nonetheless, it remains that the City undertook an obligation to "*reasonably work with*" Trudy's while Trudy's was attempting to obtain these approvals and permits.

The City dismisses the notion that its agreement to "reasonably work with" Trudy's has any significance because, it suggests, City employees always act reasonably or are at least supposed to. We express no opinion as to that assertion because, true or false, it has no bearing on our construction of the Rule 11 agreement. As with any other contract, we must construe each part

---

[9] The City does not contend that its governmental immunity bars Trudy's counterclaims or otherwise dispute that the Rule 11 agreement binds it to the same extent as it would any other litigant. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375-77 (Tex. 2006); *Texas Co. v. State*, 281 S.W.2d 83, 90 (Tex. 1955).

36

of the Rule 11 agreement in relation to the other so that no part will be rendered meaningless. *Valence Operating Co.*, 164 S.W.3d at 662. We cannot simply deem the City's contractual duty to "reasonably work with" Trudy's to be redundant surplusage, as the City suggests.

We are to give this language its plain, ordinary, and generally accepted meaning. *See id.* "Reasonable" denotes "[f]air, proper, or moderate under the circumstances," "[a]ccording to reason," "[h]aving the faculty of reason." Black's Law Dictionary 1379 (7th ed. 1999); *see also* Webster's Third New Int'l Dictionary 1892 (1986) ("being in agreement with right thinking or right judgment," "not conflicting with reason," "not absurd," "not ridiculous," "being or remaining within the bounds of reason," "not extreme," "not excessive"). Reasonableness, for example, is the core concept of negligence law—one generally has a duty of care to act as an ordinary reasonable person under the same or similar circumstances. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). Where a duty to act reasonably exists, whether or not it is breached is generally a question of fact. *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex. App.—Dallas 2004, pet. denied).

Informed by these definitions and concepts, the summary-judgment evidence, which we have previously summarized, raises a genuine issue of material fact as to whether the City complied with its duty to "*reasonably* work with [Trudy's]" in Trudy's efforts to bring its improvements into compliance with the Code. In light of this holding, we conclude that the district court erred in granting summary judgment that Trudy's take nothing on its counterclaim against the City for breach of the Rule 11 agreement. We similarly conclude that this evidence presents fact issues precluding summary judgment on Trudy's affirmative defense that the City's

breach was material and excused any failure of Trudy's to "substantially complete" the approval and permitting process by the June 2, 2006 deadline. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 198-200 (Tex. 2004).

Furthermore, apart from Trudy's affirmative defense of prior material breach, we conclude that the fact issues as to whether the City acted reasonably also preclude summary judgment on Trudy's affirmative defense that the City failed to satisfy a condition precedent to pursing its litigation against Trudy's. As discussed, the City obligated itself in the Rule 11 agreement to defer litigation against Trudy's while affording Trudy's an opportunity to bring its improvements into compliance with the Code. "In the event that [Trudy's] violates the terms of this agreement," the City had the right to "go to district court and seek any and all remedies available to it under this agreement, at law, or in equity." The City insists that it conclusively established that Trudy's failed to "substantially complete" the approval and permitting process, especially since the parties agreed that "[t]he City will made the determination of what is 'substantially complete,' not [Trudy's]." However, we cannot read this provision in isolation, but must construe it in light of the City's obligation to "reasonably work with Trudy's to come into compliance with the City Code development restrictions and meet all application deadlines." *See Valence Operating Co.*, 164 S.W.3d at 662. In other words, the fact issues as to whether the City reasonably worked with Trudy's also raise fact issues as to whether the City acted reasonably in determining that Trudy's had failed to "substantially complete" the approval process and, thus, whether Trudy's breached that provision. This, in turn, raises a fact issue as to Trudy's affirmative defense that the City failed to

38

establish a condition precedent to pursuing its legal remedies against Trudy's. We sustain Trudy's second and third issues.

**Relief exceeding grounds in summary-judgment motion**

In its fourth issue, Trudy's argues that the district court erred in granting more relief than the City requested in its motion for summary judgment. The City sought summary judgment on its declaratory and injunctive claims and Trudy's affirmative defenses against these claims. It also sought summary judgment on Trudy's counterclaim that the City breached the Rule 11 agreement. However, as Trudy's points out, the City did not expressly seek summary judgment on Trudy's counterclaims for declaratory, mandamus, and injunctive relief.

The City's traditional motion did not state grounds for summary judgment as to Trudy's claims for mandamus relief. Consequently, the district court erred in granting the City summary judgment on those claims. *See Bandera Elec. Co-Op, Inc. v. Gilchrist*, 946 S.W.2d 336, 336-38 (Tex. 1997) (per curiam).

While not explicitly addressed in the City's summary-judgment motion, Trudy's declaratory and injunctive claims were largely the converses of the City's declaratory and injunctive claims. Thus, the City's motion for summary-judgment on its own claims was potentially sufficient to encompass the substance of Trudy's claims as well. *See Ortiz v. Collins*, 203 S.W.3d 414, 423 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (summary judgment may be granted on claims not expressly addressed where summary-judgment motion is sufficiently broad to encompass the substance of the claims). We need not determine whether it was, however, because assuming

so, we would reverse summary judgment on those claims for some of the same reasons we have reversed the judgment as to the City's claims.

We sustain Trudy's fourth issue.

## CONCLUSION

While we have overruled Trudy's estoppel issue, we have sustained its other three issues challenging the district court's summary judgment. We reverse the judgment and remand for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop;
   Chief Justice Law not participating

Affirmed in part; Reversed and Remanded in part

Filed: March 12, 2010