# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-17-00812-CV

---

**Appellants, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch//
Cross-Appellants, City of Austin, Texas; and Steve Adler, Mayor of The City of Austin, and the State of Texas**

**v.**

**Appellees, City of Austin, Texas; and Steve Adler, Mayor of The City of Austin//
Cross-Appellees, Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch**

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-16-002620, THE HONORABLE TIM SULAK, JUDGE PRESIDING**

---

## **O P I N I O N**

These cross-appeals arise from challenges to a municipal ordinance amending the City of Austin's regulation of short-term rental properties. *See* Austin, Tex., Ordinance No. 20160223-A.1 (Feb. 23, 2016) (codified in Austin City Code chapters 25-2 and 25-12). Appellants Ahmad Zaatari, Marwa Zaatari, Jennifer Gibson Hebert, Joseph "Mike" Hebert, Lindsay Redwine, Ras Redwine VI, and Tim Klitch (collectively, "Property Owners") own homes in the Austin area and sued the City and its mayor (collectively, "the City"), asserting that certain provisions in the ordinance are unconstitutional. Specifically, the Property Owners challenged the ordinance provision that bans short-term rentals of non-homestead properties, *see id.* § 25-2-950, and the ordinance provision that controls conduct and types of assembly at short-

term rental properties, *see id.* § 25-2-795. The State intervened in the Property Owners' suit to contend that the ordinance's ban on short-term rentals of non-homestead properties is unconstitutional as a retroactive law and as an uncompensated taking of private property. The Property Owners and the State appeal from the district court's order granting the City's no-evidence motion for summary judgment and denying the Property Owners' and the State's traditional motions for summary judgment. The City and the State also challenge the district court's orders excluding certain evidence from the summary-judgment record. On cross-appeal, the City challenges the district court's order overruling the City's plea to the jurisdiction.

The ordinance provision banning non-homestead short-term rentals significantly affects property owners' substantial interests in well-recognized property rights while, on the record before us, serving a minimal, if any, public interest. Therefore, the provision is unconstitutionally retroactive, and we will reverse the district court's judgment on this issue and render judgment declaring the provision void. The ordinance provision restricting assembly infringes on Texans' fundamental right to assemble because it limits peaceable assembly on private property. Therefore, because the City has not demonstrated that the provision is narrowly tailored to serve a compelling state interest, the provision violates the Texas Constitution's guarantee to due course of law, and we will reverse the district court's judgment on this issue and render judgment declaring the provision void. We will affirm the remainder of the judgment and remand the case to the district court for further proceedings consistent with this opinion.

## Background

In the last decade, individuals have increasingly turned to short-term rentals— typically, privately owned homes or apartments that are leased for a few days or weeks at a

time—for lodging while traveling. *See, e.g.*, Donald J. Kochan, *The Sharing Stick in the Property Rights Bundle*, 86 U. Cin. L. Rev. 893, 894–95 (2018) (collecting sources). As short-term rentals have become more common, local governments have looked for ways to balance the rights of short-term rental property owners and tenants against the concerns of neighboring properties. In 2012, the City adopted an ordinance to regulate Austinites' ability to rent their properties through amendments to the zoning and land-development chapters of its municipal code. *See* Austin, Tex., Ordinance 20120802-122 (Aug. 2, 2012) (codified at Austin, Tex., Code Chs. 25-2 and 25-12). That ordinance defined short-term rental use as "the rental of a residential dwelling unit or accessory building, other than a unit or building associated with a group residential use, on a temporary or transient basis." *Id.* § 25-2-3(10). The 2012 ordinance also required property owners to satisfy eligibility criteria and obtain a license before being allowed to rent their property on a short-term basis. *Id*. §§ 25-2-788(B), 25-2-789(B).

In 2016, after conducting several studies and holding hearings regarding short-term rentals and their role in the community, the City adopted an ordinance amending its regulations of short-term rentals. *See* Austin, Tex., Ordinance 20160223-A.1. As amended by the 2016 ordinance, the City Code created three classes of short-term rentals:

- Type 1—single-family residence that is "owner-occupied or is associated with an owner-occupied principal residential unit," Austin, Tex., Code § 25-2-788(A);

- Type 2—single-family residence that "is not owner-occupied and is not associated with an owner-occupied principal residential unit," *id.* § 25-2-789(A); and

- Type 3—residence that is "part of a multi-family residential use," *id.* § 25-2-790(A).[1]

---

[1] The parties agree that, as a practical matter, type-1 status is determined based on whether the owner claims the property as a homestead for tax purposes. *See* Austin, Tex., Code § 25-2-788.

3

The ordinance immediately suspended the licensing of any new type-2 short-term rentals and established April 1, 2022, as the termination date for all type-2 rentals. *See id*. § 25-2-950.

The 2016 ordinance also imposed several restrictions on properties operated as short-term rentals, including:

- banning all assemblies, including "a wedding, bachelor or bachelorette party, concert, sponsored event, or any similar group activity other than sleeping," whether inside or outside, after 10:00 p.m.;

- banning outdoor assemblies of more than six adults at any time;

- prohibiting more than six unrelated adults or ten related adults from using the property at any time; and

- giving City officials authority to "enter, examine, and survey" the short-term rentals to ensure compliance with applicable provisions of Code.

*See id.* §§ 25-2-795(D)–(G), 25-12-213-1301. Failure to comply with these provisions is punishable by a fine of up to $2,000 and possible revocation of the operating license. *See id*. § 25-1-462.

In response to the ordinance, the Property Owners sued the City for declaratory and injunctive relief, alleging that section 25-2-795's assembly and occupancy restrictions and section 25-2-950's ban on type-2 short-term rentals violate, facially and as applied, constitutional rights to privacy, freedom of assembly and association, due course of law, equal protection, and freedom from unwarranted searches. *See* Tex. Const. art. I, §§ 3 (equal protection), 9 (searches), 19 (due course of law), 27 (assembly); *Texas State Emps. Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987) (individual privacy).[2] The Property Owners also sought attorney fees. *See* Tex. Civ. Prac. & Rem. Code § 37.009. The State of

---

[2] The Property Owners bring their privacy, assembly, and association claims within the framework of the due-course-of-law and equal-protection clauses of the Texas Constitution.

4

Texas intervened in the Property Owners' case, arguing that section 25-2-950's termination of type-2 operating licenses by 2022 is unconstitutional as a retroactive law and an uncompensated taking of private property. *See* Tex. Const. art. I, §§ 16 (retroactive laws), 17 (takings).

The Property Owners and the State moved for summary judgment on their constitutional challenges to the ordinance, providing evidentiary exhibits in support of those motions.[3] The City filed a plea to the jurisdiction and a no-evidence motion for summary judgment. The State and the City each filed objections to certain aspects of the evidentiary record. The district court denied the traditional motions for summary judgment, overruled the City's plea to the jurisdiction, granted the City's motion for no-evidence summary judgment, and sustained in part the State's and the City's respective evidentiary objections. The Property Owners and the State appeal from the district court's order denying their motions for summary judgment and granting the City's motion for summary judgment. The State also appeals from the district court's order sustaining the City's evidentiary objections. The City cross-appeals from the district court's order overruling its plea to the jurisdiction and from the order sustaining the State's evidentiary challenges.

**Jurisdiction**

Because it implicates our authority to reach the merits of this dispute, we begin by addressing the district court's order overruling the City's plea to the jurisdiction. *See Crites v. Collins*, 284 S.W.3d 839, 840 (Tex. 2009) (noting that jurisdictional questions must be addressed before merits). A trial court's jurisdiction is a question of law we review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "[I]f a plea to the jurisdiction

---

[3] The Property Owners' motion for summary judgment did not include their request for attorney fees.

challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id*. at 227 (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)). "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action"—as is the case here—"and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Id*. "If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Id*. at 227–28.

The City's plea to the jurisdiction challenges the State's standing to intervene in this dispute, the Property Owners' standing to bring claims on behalf of tenants, and the ripeness of the underlying claims. The plea also invokes governmental immunity, arguing that the Property Owners and the State have not pleaded any claim for which the City's immunity is waived or otherwise inapplicable. We address these arguments in turn.

## A. Standing

The City contests the State's standing to intervene in this matter and the Property Owners' standing to bring claims on behalf of their tenants. "Standing is implicit in the concept of subject matter jurisdiction," and is therefore properly challenged in a plea to the jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd*., 852 S.W.2d 440, 444 (Tex. 1993). In general, to establish standing to seek redress for injury, "a plaintiff must be personally aggrieved." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) (citing *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist*., 925 S.W.2d 659, 661 (Tex. 1996)). In addition, "his alleged injury must be concrete and particularized, actual or imminent, not hypothetical." *Id*. at 304–05 (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)); *see Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560–561 (1992); *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001); *Texas Ass'n of Bus.*, 852 S.W.2d at 444. "A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress." *Inman*, 252 S.W.3d at 305. These common-law standards, however, are not dispositive if the Legislature has conferred standing by statute. *See In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) (considering standing under certain provisions of Texas Family Code); *but see Grossman v. Wolfe*, 578 S.W.3d 250, 257 n.4 (Tex. App.—Austin 2019, pet. denied) (noting that U.S. Supreme Court has rejected statutorily created standing).

The State's standing to intervene in this matter is unambiguously conferred by the Uniform Declaratory Judgment Act, which provides:

> In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

Tex. Civ. Prac. & Rem. Code § 37.006(b). The Property Owners filed suit in 2016, raising a constitutional challenge to the amendments enacted by ordinance 20160223-A.1. If they prevail, the unconstitutional provisions will be declared void. The suit therefore "involves the validity of a municipal ordinance" such that the State is "entitled to be heard" in this proceeding. *Id.*; *see Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 433–34 (Tex. App.—Austin 2018, pet. filed) (explaining State's right to intervene in constitutional challenge to municipal ordinance).

7

The City also contests the Property Owners' right to raise constitutional claims on behalf of their tenants. "Generally, courts must analyze the standing of each individual plaintiff to bring each individual claim he or she alleges." *Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 77 (Tex. 2015) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 152 (Tex. 2012)). "However, 'where there are multiple plaintiffs in a case who seek injunctive or declaratory relief . . . the court need not analyze the standing of more than one plaintiff—so long as [one] plaintiff has standing to pursue as much or more relief than any of the other plaintiffs.'" *Id*. (quoting *Heckman*, 369 S.W.3d at 152 n.64). "The reasoning is fairly simple: if one plaintiff prevails on the merits, the same prospective relief will issue regardless of the standing of the other plaintiffs." *Id*. (citations omitted). Here, at least one of the Property Owners is both an operating licensee and a tenant of short-term rentals. That property owner asks the court to enjoin enforcement of the ordinance and to declare it void in part due to allegedly unconstitutional provisions restricting short-term tenants' rights to association, assembly, freedom of movement, and privacy. As a tenant, she herself "ha[s] suffered some actual restriction" under the challenged provisions, and she seeks the greatest possible prospective relief the court might afford. *See id*. She therefore has standing to pursue these claims, and "we need not analyze the standing" of the remaining Property Owners with respect to claims brought on behalf of short-term tenants. *See id*.

**B. Ripeness**

The City contends that because parts of the ordinance do not take effect until 2022 and because—in the City's view—the Property Owners have not yet suffered any concrete injury, any challenge to the ordinance is not yet ripe. We disagree.

Ripeness is a jurisdictional prerequisite to suit. *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442–43 (Tex. 1998). A claim ripens upon the existence of "a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (quoting *Bexar–Medina–Atascosa Ctys. Water Control & Improvement Dist. No. 1 v. Medina Lake Prot. Ass'n*, 640 S.W.2d 778, 779–80 (Tex. App.—San Antonio 1982, writ ref'd n.r.e)). Ripeness requires "a live, non-abstract question of law that, if decided, would have a binding effect on the parties." *Heckman*, 369 S.W.3d at 147 (citing *Brown*, 53 S.W.3d at 305). Ripeness is "peculiarly a question of timing." *Perry v. Del Rio*, 66 S.W.3d 239, 249–51 (Tex. 2001) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). A case is not ripe if it involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Patterson*, 971 S.W.2d at 442 (quoting 13A Charles A. Wright et al., *Federal Practice & Procedure* § 3532, at 112 (2d ed. 1984)).

This controversy is ripe for adjudication. The Property Owners raise a facial challenge to an ordinance adopted in February of 2016. Some provisions took effect immediately, others were retroactively applied to certain license applications filed in 2015, and others will take effect beginning April 1, 2022. It is undisputed that these provisions limit the Property Owners' rights with respect to their properties, including restricting the number of tenants, the term of tenancy, and the permissible uses of the property during short-term rental

9

tenancy. The ordinance is already in effect, so there is no risk that its impact "may not occur at all." *Id.* at 442. Facial challenges to ordinances are "ripe upon enactment because at that moment the 'permissible uses of the property [were] known to a reasonable degree of certainty.'" *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 60 (Tex. 2006) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001)) (alteration in original).

And while the City argues the Property Owners have not yet "suffered economic harm" from the provision terminating type-2 operation in 2022, that fact would not forestall adjudication of this dispute even assuming, for the sake of argument, it is an accurate characterization of the circumstances. As a general matter, courts have long recognized that an aggrieved plaintiff may seek redress "when a wrongful act causes some legal injury . . . even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex. 1994); *Quinn v. Press*, 140 S.W.2d 438, 440 (Tex. 1940)). But more specifically, because the plaintiffs and intervenors allege a facial abridgment of their most fundamental rights under the United States and Texas Constitutions, the City's alleged constitutional overreach itself is an injury from which the Property Owners and the State seek relief. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (finding jurisdiction over facial challenge where statute had not yet been enforced and no injury in fact had yet occurred); *City of Laredo v. Laredo Merchants Assoc.*, 550 S.W.3d 586, 590 (Tex. 2018) (allowing constitutional challenge to ordinance where suit filed before effective date); *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626–27 (Tex. 1996) (rejecting State's argument that plaintiffs "must actually be deprived of their property before they can maintain a [facial] challenge to this statute"). The district court did not err in rejecting the City's ripeness arguments.

## C. Jurisdiction over the Subject Matter

In its final challenge to jurisdiction, the City invokes its immunity from suit. To overcome governmental immunity from suit and thereby establish jurisdiction over this case, the Property Owners must plead a viable claim for which governmental immunity is waived or otherwise inapplicable. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 475 (Tex. 2012). Governmental immunity does not shield the City from viable claims for relief from unconstitutional acts. *See General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001) ("[T]he doctrine does not shield the State from an action for compensation under the takings clause." (citations omitted)); *Board of Trustees v. O'Rourke*, 405 S.W.3d 228, 237 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("Generally, governmental immunity does not shield a governmental entity from a suit for declaratory relief based on alleged constitutional violations." (citations omitted)). Here, both the Property Owners and the State have raised constitutional challenges to the City's ordinance. As discussed in further detail in our analysis of summary judgment, two of these claims are meritorious—and thus viable—challenges to the constitutionality of the ordinance. Accordingly, the parties have successfully established the district court's jurisdiction over the controversy, and the court did not err in overruling the City's plea to the jurisdiction.

We overrule the City's jurisdictional issues.

## Evidentiary Rulings

Before turning to the district court's orders granting the City's no-evidence motion for summary judgment and denying the two traditional motions, we must determine which evidence is properly before the court. *See Fort Brown Villas III Condo. Ass'n, Inc. v.*

11

*Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009) (explaining importance of evidentiary rulings in context of no-evidence summary judgment). The State and the City filed objections to evidence offered on the cross-motions. The district court sustained these objections in part, and two evidentiary exhibits remain at issue on appeal. The State appeals from the district court's order excluding sworn declarations obtained from several owners of short-term rentals in the Austin area, and the City challenges the exclusion of thousands of pages documenting the legislative history of the ordinance, which the district court excluded as unnecessarily voluminous. A district court's decision to exclude evidence is reviewed for abuse of discretion. *Capital Metro. Transp. Auth v. Central of Tenn. Ry. & Nav. Co.*, 114 S.W.3d 573, 583 (Tex. App.—Austin 2003, pet. denied). "A trial court abuses its discretion if it acts without reference to any guiding rules and principles." *Id.* (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

## A. Exclusion of State's Affidavits

The district court excluded several sworn declarations the State had obtained from owners of short-term rentals, accepting the City's argument that the declarations are irrelevant and that the names of the declarants were not timely disclosed by the State. We agree with the State that the district court abused its discretion in sustaining the objection.

To begin with, this evidence is relevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. Relevant evidence must be admitted unless admission is otherwise prohibited by state or federal law. *Id.* R. 402. The disputed declarations include, for example, evidence of how long short-term rentals have existed in Austin, what makes them profitable, where they are located, how often they are occupied, and

12

the financial impact the owners anticipate from the ordinance. This information is critical to "determining the action"—that is, determining whether the ordinance violates any constitutional rights—and is therefore relevant.

This relevant evidence was not rendered inadmissible by the State's allegedly untimely disclosure of the names of the declarants. "A party must respond to written discovery in writing within the time provided by court order or these rules." Tex. R. Civ. P. 193.1. "When responding to written discovery, a party must make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made." *Id*. "If a party learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response . . . ." *Id*. R. 193.5. "A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed . . . unless the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties." *Id*. R. 193.6.

Under the circumstances of this case, the State timely disclosed its intent to rely on testimony from these owners. In mid-March 2017, before the close of discovery, the State explained in its response to the City's request for disclosure that "individuals who currently hold, or were previously granted, Short-Term Rental (STR) permits by [the City], and the individuals who testified at any public hearing on short-term rental regulations" were persons who had knowledge of facts relevant to its case. *See id.* R. 194.2(e) (authorizing party to request disclosure of names "of persons having knowledge of relevant facts"). When the State made this

13

general disclosure, the City had recently—mid-February—provided discovery responses listing the names of all the short-term rental licensees, but the State had not yet had time to identify from that list the specific witnesses that it intended to rely on and the evidence those witnesses would provide. The State's response to the City's request was therefore complete "based on all information reasonably available to [the State] or its attorney at the time the response [wa]s made." *Id*. R. 193.1.

Once the State identified its witnesses and the evidence those witnesses would provide, it disclosed that information to the City in a supplemental disclosure. *See id.* R. 193.5(a) (requiring responding party to amend or supplement incomplete or incorrect discovery responses "reasonably promptly"). This supplementation occurred in mid-May 2017; three months after the State had received the evidentiary information from the City and approximately six months before the hearing at which the declarations were offered as evidence. As such, the State's supplementation was reasonably prompt. *See id.*; *see also id.* R. 193.5(b) (amended or supplemental responses made less than 30 days before trial are presumed to not be reasonably prompt). Thus, the district court abused its discretion in sustaining the City's objection and excluding the declarations of Carole Price, Cary Reynolds, Pete Gilcrease, Gregory Cribbs, Rachel Nation, and Travis Sommerville. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (noting that failure to analyze or apply law correctly constitutes abuse of discretion).

We sustain the State's evidentiary issue.

**B. Exclusion of City's Legislative History**

The City complains of the district court's exclusion of its proffered legislative history, which the State had argued was "too voluminous" to be useful. We find it unnecessary to decide whether the exclusion was erroneous, as we may take judicial notice of this history.

14

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be question." Tex. R. Evid. 201. The City offers this history primarily as evidence of its need to address public concerns regarding the presence of short-term rentals in certain parts of Austin. Setting aside the question of whether the hearing testimony and other legislative history accurately characterize the impact of short-term rentals, the fact that these concerns were previously raised by residents and other stakeholders is a matter of municipal record and "is not subject to reasonable dispute." *Id.* We therefore will incorporate the aspects of this history that the City relies on in our analysis of the merits of this dispute.

### Summary Judgment

The district court granted the City's no-evidence motion for summary judgment and denied the traditional motions filed by the Property Owners and the State. "When . . . parties move for summary judgment on overlapping issues and the trial court grants one motion and denies the other[s], we consider the summary-judgment evidence presented by both sides and determine all questions presented." *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs*, 524 S.W.3d 734, 738 (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). "If we determine that the trial court erred, we render the judgment the trial court should have rendered." *Id*. We make this determination de novo. *Id*.

The State and the Property Owners filed traditional motions for summary judgment on their claims regarding the constitutionality of the ordinance. The City filed a cross-motion for summary judgment challenging those constitutionality claims on no-evidence

grounds. "Summary judgment is proper when the summary-judgment evidence shows that there are no disputed issues of material fact and that the movant is entitled to judgment as a matter of law." *Texas Ass'n of Acupuncture*, 524 S.W.3d at 738 (citing Tex. R. Civ. P. 166a(c)). "A movant seeking traditional summary judgment on its own cause of action has the initial burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its cause of action." *Id*. (citing *Trudy's Tex. Star, Inc. v. City of Austin*, 307 S.W.3d 894, 905 (Tex. App.—Austin 2010, no pet.)). "To obtain traditional summary judgment on an opposing party's claims, the movant must conclusively negate at least one element of each of the claims or conclusively establish each element of an affirmative defense." *Id*. (citing *Lakey v. Taylor*, 435 S.W.3d 309, 316 (Tex. App.—Austin 2014, no pet.)).

A party may move for no-evidence summary judgment when, "[a]fter adequate time for discovery[,] . . . there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). "The motion must state the elements as to which there is no evidence." *Id*. "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." *Id*. When reviewing a no-evidence summary judgment, we "review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006)).

16

## A. The State's Retroactivity Claim

The State argues that section 25-2-950 of the Austin City Code, which terminates all type-2 rentals by 2022, is unconstitutionally retroactive. We agree.

The Texas Constitution prohibits the creation of retroactive laws. *See* Tex. Const., art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). The prohibition against retroactive laws has two fundamental objectives: "[I]t protects the people's reasonable, settled expectations"—i.e., "the rules should not change after the game has been played"—and it "protects against abuses of legislative power." *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 139 (Tex. 2010) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265–266 (1994)).

A retroactive law is one that extends to matters that occurred in the past. *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014) (citing *Robinson*, 335 S.W.3d at 138). "A retroactive statute is one which gives preenactment conduct a different legal effect from that which it would have had without the passage of the statute." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 60 (Tex. 2014) (quoting Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 692, 692 (1960)). The State contends that the ordinance provision terminating all type-2 operating licenses is retroactive because it "tak[es] away th[e] fundamental and settled property right" to lease one's real estate under the most desirable terms. The City disagrees with the State's characterization of the ordinance's effect, but it does not dispute that the ordinance is retroactive. We agree that section 25-2-950 operates to eliminate well-established and settled property rights that existed before the ordinance's adoption. *See Robinson*, 335 S.W.3d at 139 (noting that "[m]ost statutes operate to change existing conditions"); Hochman, 73 Harv. L. Rev. at 692.

17

But not all retroactive laws are unconstitutional. *Robinson*, 335 S.W.3d at 139. ("Mere retroactivity is not sufficient to invalidate a statute."). To determine whether a retroactive law violates the Texas Constitution's prohibition against retroactive laws, we must consider three factors in light of the prohibition's objectives of protecting settled expectations and of preventing legislative abuses: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;" (2) "the nature of the prior right impaired by the statute;" and (3) "the extent of the impairment." *Id.* at 145. This three-part test acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption. *Tenet*, 445 S.W.3d at 707 (citing *Robinson*, 335 S.W.3d at 145). But it also appropriately encompasses the notion that "statutes are not to be set aside lightly." *Id*.

We begin by considering the first *Robinson* factor, "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings," to determine if there is a compelling public interest. *Robinson*, 335 S.W.3d at 145; *see Tenet*, 445 S.W.3d at 707. Here, as was the case regarding the statute deemed unconstitutionally retroactive in *Robinson*, the City made no findings to justify the ordinance's ban on type-2 rentals. Based on the legislative record before us and the other facts relevant to determining the reasons for the City's actions, *see Robinson*, 335 S.W.3d at 145 (considering entire legislative record and additional related information in applying its three-prong test), the City's purported public interest for banning type-2 rentals is slight. The City contends that it enacted short-term rental regulations to address the following public-interest issues relating to short-term rentals:

- Public-health concerns about over-occupancy affecting the sewage system and creating fire hazards and about "bad actor" tenants who dump trash in the neighborhood and urinate in public;

- public-safety concerns regarding strangers to neighborhoods, public intoxication, and open drug use;

- general-welfare concerns about noise, loud music, vulgarity, and illegal parking; and

- the negative impact on historic Austin neighborhoods, specifically concerns of residents that that short-term rentals alter a neighborhood's quality of life and affect housing affordability.

The City does not explain which of these public-interest issues supports a ban on type-2 short-term rentals, and notably, there is nothing in the record before us to show that any of these stated concerns is specific or limited to type-2 short-term rentals. Type-2 short-term rentals are simply single-family residences that are not owner-occupied or associated with an owner-occupied principal residential unit—i.e., they are not designated as the owner's homestead for tax purposes. *See* Austin, Tex., Code § 25-2-789(A).

More importantly, nothing in the record supports a conclusion that a ban on type-2 rentals would resolve or prevent the stated concerns. In fact, many of the concerns cited by the City are the types of problems that can be and already are prohibited by state law or by City ordinances banning such practices. *See* Tex. Penal Code §§ 42.01 (disorderly conduct), 49.02 (public intoxication); Austin, Tex., Code §§ 9-2-1–9-2-65 (noise ordinance), 9-4-15 (prohibiting public urination and defecation), 10-5-42–10-5-45 (littering ordinance), 12-5-1–12-2-44 (parking ordinance). Relatedly, nothing in the record shows that these issues have been problems with or specific to short-term rentals in the past. To the contrary, the record shows that, in the four years preceding the adoption of the ordinance, the City did not issue a single citation to a licensed short-term rental owner or guest for violating the City's noise, trash, or parking ordinances. And

during this same four-year period, the City issued notices of violations—not citations—to licensed short-term rentals only ten times: seven for alleged overoccupancy, two for failure to remove trash receptacles from the curb in a timely manner, one for debris in the yard, and none for noise or parking issues. And the City has not initiated a single proceeding to remove a property owner's short-term rental license in response to complaints about parties. Further, the record shows that short-term rentals do not receive a disproportionate number of complaints from neighbors. In fact, as the City acknowledges, "short-term rental properties have significantly fewer 311 calls and significantly fewer 911 calls than other single-family properties."

We also note that a ban on type-2 short-term rentals does not advance a zoning interest because both short-term rentals and owner-occupied homes are residential in nature. *See Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291 (Tex. 2018) (declining to interpret "residential" as prohibiting short-term rentals). And, in fact, the City treats short-term rentals as residential for purposes of its own laws. *See* Austin, Tex., Code § 25-2-4(B).

In sum, based on the record before us, we conclude that the purported public interest served by the ordinance's ban on type-2 short-term rentals cannot be considered compelling. The City did not make express findings as to the ordinance. Nothing in the record before us suggests that the City's reasons for banning type-2 rentals address concerns that are particular to type-2 rentals or that the ban itself would actually resolve any purported concerns. *See Tenet*, 445 S.W.3d at 707 (holding that retroactive provision of legislation that "was a comprehensive overhaul of Texas medical malpractice law" served compelling public interest); *Synatzske*, 438 S.W.3d at 58 (holding that retroactive legislation aimed at resolving asbestos-related litigation crisis and supported by legislative fact findings served compelling public

20

interest); *Robinson*, 335 S.W.3d at 143–44 (holding that retroactive legislation ostensibly enacted for sole benefit of one entity and not supported by legislative fact findings did not serve compelling public interest).

But even if we were to determine that the City's ban on type-2 rentals advances a compelling interest, our consideration of the remaining *Robinson* factors, which require that we balance the purpose against the nature of the prior right and the extent to which the statute impairs that right, would still require us to conclude that the ban is unconstitutionally retroactive. *See Robinson*, 335 S.W.3d at 147–48. Regarding the nature of the prior right, we consider not whether the impaired right was "vested," but the extent to which that right was "settled." [4] *Id.* at 142–43, 147, 149. In *Robinson*, for example, the Court held that the plaintiffs had a settled expectation that the Legislature would not extinguish their already filed common-law personal injury suit. *Id*. at 147–49. By contrast, the supreme court held in *Synatzke* that plaintiffs asserting a statutory cause of action after the Legislature altered certain aspects of that statute had no settled expectation in the previous version of the statute because "the Legislature may repeal a statute and immediately eliminate any right or remedy that the statute previously granted." .

Private property ownership is a fundamental right. *Hearts Bluff*, 381 S.W.3d at 476 (citing *Severance v. Patterson*, 370 S.W.3d 705 (Tex. 2012)). "The right of property is the right to use and enjoy, or dispose of the same, in a lawful manner and for a lawful purpose." *Id.*; *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36 (1982) (noting that

---

[4] Ignoring recent precedent from our high court, the City incorrectly engages in a vested-rights analysis to determine whether the ordinance is unconstitutionally retroactive. *See Robinson*, 335 S.W.3d at 143 ("What constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity.").

property owners have "rights to possess, use and dispose of" their property).  The ability to lease property is a fundamental privilege of property ownership.  *See Terrace v. Thompson*, 263 U.S. 197, 17–18 (1923) (noting that "essential attributes of property" include "the right to use, lease and dispose of it for lawful purposes"); *Calcasieu Lumber Co. v. Harris*, 13 S.W. 453, 454 (Tex. 1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership."); *see also* Ross, Thomas, *Metaphor and Paradox*, 23 Ga. L. Rev. 1053, 1056 (1989) (noting that "rights to sell, lease, give, and possess" property "are the sticks which together constitute" the metaphorical bundle).  Granted, the right to lease property for a profit can be subject to restriction or regulation under certain circumstances, *see Loretto*, 458 U.S. at 436 (noting in physical-takings case that "deprivation of the right to use and obtain a profit from company is not, in every case, independently sufficient to establish a taking"); *Severance*, 370 S.W.3d at 709–10 (noting few limitations on property rights), but the right to lease is nevertheless plainly an established one, *see Tenet*, 445 S.W.3d at 708 (analyzing whether claim was established).

And as for the specific right at issue here—i.e., to lease one's property on a short-term basis—the City acknowledges that Austinites have long exercised their right to lease their property by housing short-term tenants.  In fact, the City admits, and the record establishes, that short-term rentals are an "established practice" and a "historically . . . allowable use."  The record also shows that property owners, including some of the appellants here, who rented their individual properties as type-2 short-term rentals before the City's adoption of the provision eliminating those types of rentals did so after investing significant time and money into the

22

property for that purpose. The record also shows that the City's ban on type-2 short-term rentals will result in a loss of income for the property owners.

Accordingly, based on the record before us and the nature of real property rights, we conclude that owners of type-2 rental properties have a settled interest in their right to lease their property short term.

The City emphasizes that the ban does not go into effect until 2022, suggesting that the grace period would allow property owners to adjust their investment strategy to prepare for the discontinuance of type-2 short-term rentals. *See Tenet*, 445 S.W.3d at 708–09 (discussing grace period afforded by retroactive legislation); *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997) (determining that applying immunity provisions of Texas Tort Claims Act was not unconstitutionally retroactive when the plaintiff had two months to sue before it became effective). But the issue here is not about property owners' right to use their property in a certain way—it is about owners of type-2 short-term rentals retaining their well-settled right to lease their property.

We now turn to the third *Robinson* factor, which directs us to consider the extent of the ordinance's impairment to these settled rights. *See Robinson*, 335 S.W.3d at 145. The effect of the ordinance on the property right at issue here is clear—the City's ordinance eliminates the right to rent property short term if the property owner does not occupy the property. The elimination of a right plainly has a significant impact on that right. *See id.* at 148 (concluding that statute that extinguished plaintiff's claim in Texas had a "significant[] impact[]").

Because the record before us shows that the ordinance serves a minimal, if any, public interest while having a significant impact on property owners' substantial interest in a

23

well-recognized property right, we hold that section 25-2-950's elimination of type-2 short-term rentals is unconstitutionally retroactive. *See id.* at 150; *see also Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 204 (Tex. 2012) (noting that preservation of property rights is "one of the most important purposes"—in fact, "[t]he great and chief end"—of government). Accordingly, we affirm the State's first issue on appeal. And having determined that section 25-2-950 is unconstitutionally retroactive, we need not address the State's and the Property Owners' remaining constitutional challenges to that same section. *See* Tex. R. App. P. 47.1 (requiring appellate court to hand down "opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

## B. Property Owner's Assembly Clause Claim

The Property Owners assert that section 25-2-795 of the Austin City Code, which bans types of conduct and assembly at short-term rental properties, violates the Texas Constitution's due-course-of-law provision. *See* Tex. Const. art. I, § 19 (due course of law); Austin, Tex., Code § 25-2-795 (forbidding property owner or tenant from using short-term rental for assemblies of any kind between 10pm and 7am and for outside assemblies of more than six adults between 7am and 10pm; and banning more than six unrelated adults (or ten related adults) from being present on the property at any time). The Texas Constitution provides: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due-process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S.

24

Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise. *See University of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) (citing *Mellinger v. City of Houston*, 3 S.W. 249, 252–53 (Tex. 1887)). Under federal and state guarantees of due process, the government may not infringe certain "fundamental" liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). The Property Owners contend that section 25-2-795 is subject to this strict-scrutiny review because it infringes on and limits short-term rental tenants' fundamental, constitutionally secured rights to freedom of assembly, association, movement, and privacy. *See id.* We conclude that section 25-2-795 fails to pass muster under strict-scrutiny review for violation of the Property Owners' freedom of assembly.[5]

*1. The "Assembly" Clause*

Both the U.S. and Texas constitutions contain assembly clauses as follows, respectively:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

---

[5] We therefore do not address the Property Owners' remaining challenges to this provision.

25

> The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance.

Tex. Const. art. 1, § 27. The Texas assembly clause differs from its federal counterpart in that it includes a "common good" requirement. The First Congress of 1789 considered including a requirement that the assembly be for "the" or "their" "common good"—e.g., James Madison offered "The people shall not be restrained from peaceably assembling and consulting for their common good."—but it ultimately rejected such text. *See* John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* 22 (2012) (citing *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 140 (Neil H. Cogan ed., 1997)).

### 2. History of the Federal Assembly Clause

In the nineteenth century, the United States Supreme Court concluded that the First Amendment did not protect the right to assemble unless "the purpose of the assembly was to petition the government for a redress of grievances." *Presser v. Illinois*, 116 U.S. 252, 267 (1886) (relying on dicta in *United States v. Cruikshank*, 92 U.S. 542 (1875)). *Presser* is the only Supreme Court opinion that has limited the right of assembly in this way, and commentators suggest that the limitation was the result of a judicial misreading of the text of the First Amendment's assembly language. *See* Inazu, at 22. Otherwise, the right to assemble featured prominently in the Supreme Court's First Amendment jurisprudence. For example, in his concurrence in *Whitney v. California*, Justice Brandeis treated free speech and assembly rights as coequal for the purposes of First Amendment analysis:

> Those who won our independence . . . believed that freedom to think as you will and to speak as you think are means

26

> indispensable to the discovery and spread of political truth; that
> without free speech and assembly discussion would be futile; that
> with them, discussion affords ordinarily adequate protection
> against the dissemination of noxious doctrine; that the greatest
> menace to freedom is an inert people; that public discussion is a
> political duty; and that this should be a fundamental principle of
> the American government.

274 U.S. 357, 375 (1927) (Brandeis, J., concurring). Soon thereafter, the Assembly Clause was incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). And in more than one hundred subsequent opinions, the Court continued to recognize the assembly clause as a right related to, but nonetheless independent from, free speech. *See* Inazu, 26, 50 ("The Court had linked these two freedoms [speech and assembly] only once before; after *Whitney*, the nexus occurs in more than one hundred of its opinions."); *see, e.g.*, *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, and therefore are united in the First Article's assurance." (citation omitted)).

Commentators have indicated that the federal right to assemble has since fallen to the wayside. In the 1950s, the Supreme Court introduced an atextual right of the First Amendment, the "freedom of association." Nicholas S. Brod, *Rethinking a Reinvigorated Right to Assemble* 63 Duke L. J. 155, 159 (2013) (citing *e.g.*, *American Commc'ns Ass'n v. Douds*, 339 U.S. 382, 409 (1950)). At first, the "freedom of association" only sporadically replaced the right to assemble. *See id.* at 159 (*comparing Douds*, 339 U.S. at 400 ("In essence, the problem is one of weighing the probable effects of the statute upon the free exercise of the right of speech

and assembly . . . ."), with *Douds*, 339 U.S. at 409 ("[T]he effect of the statute in proscribing beliefs—like its effect in restraining speech or freedom of association—must be carefully weighed by the courts . . . .")). But eventually the right to association generally displaced the right to assemble. *Id.* (noting that Supreme Court has identified as "indispensable liberties" the rights of "speech, press, [[and] association") (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958)). And, for better or worse, both assembly and association came to be treated by the Supreme Court as secondary rights enabling speech rather than coequal rights independent of speech. *See id.* (citing *NAACP*, 357 U.S. at 460 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.")).

Nevertheless, the United States Supreme Court case law continued to affirm the independence and importance of the federal right to assemble. In *Coates v. City of Cincinnati*, the high court considered an ordinance making it a criminal offense for "three or more persons to assemble" on sidewalks "in a manner annoying to persons passing by." 402 U.S. 611 (1971). The Supreme Court held that the word "annoying" is unconstitutionally vague and that "[t]he ordinance also violates the constitutional right of free assembly and association" because "[o]ur decisions establish that mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms." *Id.* at 615. In support of its holding, the Supreme Court quoted a municipal court decision striking down a similar ordinance:

> "Under the [ordinance provisions], arrests and prosecutions, as in
> the present instance, would have been effective as against Edmund
> Pendleton, Peyton Randolph, Richard Henry Lee, George Wythe,
> Patrick Henry, Thomas Jefferson, George Washington and others

28

> for loitering and congregating in front of Raleigh Tavern on Duke of Gloucester Street in Williamsburg, Virginia, at any time during the summer of 1774 to the great annoyance of Governor Dunsmore and his colonial constables."

*Id.* (quoting *City of Toledo v. Sims*, 169 N.E.2d 516, 520 (Toledo Mun. Ct. 1960)).

In *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court noted that "[f]rom the outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment Rights with which it was deliberately linked by the draftsmen." 448 U.S. 555, 577 (1980). The Court also noted that the First Congress debated whether there was a "need separately to assert the right of assembly because it was subsumed in freedom of speech," but that the motion to strike "assembly" was defeated. *Id.* at n.13. The Supreme Court quoted Mr. Page of Virginia as asserting during the debate:

> [A]t times "such rights have been opposed," and that "people have . . . been prevented from assembling together on their lawful occasions":
>
> "[T]herefore it is well to guard against such stretches of authority, by inserting the privilege in the declaration of rights. If the people could be deprived of the power of assembling under any pretext whatsoever, they might be deprived of every other privilege contained in the clause."

*Id.* (quoting 1 Annals of Cong. 731 (1789)). Thus, notwithstanding some outside commentary, the U.S. Supreme Court's case law supports a vibrant and historically grounded constitutional right to assemble.

29

## 3. *Texas's Right to Assemble*

In Texas, so far, the right to assemble has received little attention. The few cases that involve assembly claims under Texas's constitution recognize the existence and importance of the right; however, as far as we have found, none address the scope of the right to assemble. *See, e.g.*, *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 147 (Tex. 1995) (holding that there is no private right of action for damages arising under free speech and assembly sections of Texas Constitution because "anything done in violation of [Texas's bill of rights] is void"); *Bell v. Hill*, 74 S.W.2d 113, 119–20 (Tex. 1934) (recognizing that citizens' right to form political associations is protected by the U.S. Constitution's First Amendment and by Texas Constitution's assembly clause); *Faulk v. State*, 608 S.W.2d 625, 630–31 (Tex. Crim. App. 1980) (holding that Texas's riot statute did not violate right to assemble because it prohibited participation in "unlawful" assembly); *Ferguson v. State*, 610 S.W.2d 468, 470 (Tex. Crim. App. 1979) (holding that Texas riot statute did not violate right to assemble because right is limited to "peaceable assembly"); *Young v. State*, 776 S.W.2d 673, 679 (Tex. App.—Amarillo 1989, no pet.) (noting that state's ability to prohibit assemblies "must be limited in nature, be strictly construed, and must concern only assemblies . . . which, beyond cavil, threaten public peace and well being," and holding that Texas's organized-crime statute did not violate right to assemble because that right protects "the right of association for peaceful purpose" and organized-crime statute prohibits conduct that harms or disrupts the common good).

Possibly accounting for the lack of assembly-clause cases in Texas, the Texas Supreme Court has adopted the judicially created "right of association" as a right that is "instrumental to the First Amendment's free speech, assembly, and petition guarantees." *Osterberg v. Peca*, 12 S.W.3d 31, 46 (Tex. 2000). But, in contrast to the U.S. Supreme Court,

30

the Texas Supreme Court has never limited the application of Texas's assembly clause to situations where the purpose of the assembly was to petition the government for a redress of grievances. *See Presser*, 116 U.S. at 267. Nor has the Texas Supreme Court expressly held, or even considered whether, the judicially created "right of association" has subsumed the text of Texas's assembly clause, as some commentators have indicated has occurred with the federal assembly clause. We therefore rely on the plain text of the Texas Constitution to conclude that its assembly clause is not limited to protecting only petition-related assemblies and the judicially created "right of association" does not subsume the Texas Constitution's assembly clause in its entirety.

Our conclusion is also supported by significant textual differences in the two assembly clauses. First, the Texas Constitution grants an affirmative right to its citizens: "The citizens shall have the right . . . ." Tex. Const. art. I, § 27. The federal constitution, on the other hand, is prohibitive: "Congress shall make no law . . . ." U.S. Const. amend. I. Further, unlike the First Amendment's grouping of rights regarding religion, speech, the press, assembly, and petition, *see id.*, the Texas Constitution separates these and other rights across several sections in its Bill of Rights. *See* Tex. Const. art. I, §§ 1–34 ("Bill of Rights"). And while the grammatical structure of the First Amendment arguably tethers the right to assemble to the right to petition, Texas's assembly clause plainly creates two distinct rights by using a semicolon to separate the right to assemble from the right to petition: "The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27; *see* U.S. Const. amend. I (prohibiting the abridgment of "the right of the people peaceably to assemble, and to petition the Government for a redress of

grievances"); *Cruikshank*, 92 U.S. at 552 (concluding that First Amendment protected "'the right of the people to assemble and to petition the government for a redress of grievances'" (misquoting U.S. Const. amend. I)); Jason Mazzone, *Freedom's Associations*, 77 Wash. L. Rev. 639, 713 (2002) (arguing that grammatical structure of First Amendment means that assembly right can be exercised only insofar as it is used to petition the government); *cf.* Inazu, at 23 (criticizing Mazzone and arguing "the comma preceding the phrase 'and to petition' is residual from the earlier text that had described the 'right of the people peaceably to assemble and consult for their common good, and to petition the government for a redress of grievances'").

But what rights does the Texas assembly clause grant? Using the common and ordinary meaning of the text of the clause, it affirmatively grants the right to "meet together" or "to congregate" for "their" "shared or joint" "welfare or benefit." *American Heritage Dictionary of the English Language* 107, 372, 757 (5th ed. 2011) (defining "assemble," "common," and "good" respectively); *Assemble*, *The Compact Edition of the Oxford English Dictionary* (1994) (establishing that since at least the fourteenth century, "assemble" has meant "to come together into one place or company, to gather together, congregate, meet"); *see Assembly*, *The Compact Edition of the Oxford English Dictionary* (establishing that since at least the sixteenth century, "assembly" has included "gathering of persons for purposes of social entertainment"); *see also Bouillion*, 896 S.W.2d at 148 ("To interpret [the Texas] Constitution, we give effect to its plain language. We presume the language of the Constitution was carefully selected, and we interpret words as they are generally understood."). The use of "their" versus "the" to modify "common good" implies that the assembly must be for the common good of the citizens who assemble rather than the common good of the state. *See American Heritage Dictionary* at 1803–04

32

(defining "the" and "their" respectively); Inazu, at 22–23.[6]  In other words, under the plain language of the Texas Constitution, citizens have the right to physically congregate, in a peaceable manner, for their shared welfare or benefit.

We must also determine whether the right granted in the Texas assembly clause is fundamental.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (noting that due-process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests"); *Reno*, 507 U.S. at 301–02 (noting that U.S. Constitution's substantive due-process guarantee "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest").  The Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" *Washington*, 521 U.S. 720–21 (citing *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977), and *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934)), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937); *Spring Branch I.S.D. v. Stamos*, 695 S.W.3d 556, 560 (Tex. 1985) ("Fundamental rights have their genesis in the express and implied protections of personal liberty recognized in federal and state constitutions.").

---

[6]  The dissent argues that the Assembly Clause's use of the word "citizen" limits the right to matters of public discourse.  *See post* at 11.  But the word "citizen," as it is used in this clause and in thirteen other clauses of the Texas Constitution, simply describes the class of persons to whom the right applies; it does not delineate the substantive scope of the right itself.  *See* Tex. Const. art I, §§ 19 (due course of law), 20 (outlawry), 23 (right to bear arms), 25 (quartering of soldiers), 27 (assembly and petition); art. 3, §§ 6–7 (qualifications for senators and representatives), 49-b (veterans' land board); art. 4, § 4 (qualifications for governor); art. 5, §§ 1-a (state commission on judicial conduct), 2, 7 (qualifications for judiciary); art. 5, § 2 (voter qualification); art. 9, § 9 (hospital districts); *American Heritage Dictionary* at 339 (defining "citizen" as "person owing loyalty to and entitled . . . to the protection of a state or nation").

The Texas Constitution's Bill of Rights, as discussed above, expressly recognizes and protects the right of assembly. It also provides, "To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto . . . shall be void." Tex. Const. art. I, § 29. Relying on section 29, the Texas Supreme Court has held:

> The privileges guaranteed by the Bill of Rights, however, cannot be destroyed by legislation under the guise of police control. Wherever the Constitution makes a declaration of political privileges or rights or powers to be exercised by the people or the individual, it is placed beyond legislative control or interference, as much so as if the instrument had expressly declared that the individual citizen should not be deprived of those powers, privileges, and rights: and the Legislature is powerless to deprive him of those powers and privileges.

*Bell*, 74 S.W.2d at 120 (holding that First Amendment and Texas's assembly clause protect right to form political associations); *cf. Douds*, 339 U.S. at 399 ("The high place in which the right to speak, think, and assemble as you will was held by the Framers of the Bill of Rights and is held today by those who value liberty both as a means and an end indicates the solicitude with which we must view any assertion of personal freedoms."). Similarly, the Texas Supreme court has held that other rights found in the Texas Bill of Rights are fundamental rights for purposes of constitutional analysis. *See In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 375 (Tex. 1998) (orig. proceeding) ("Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment.") (citing *NAACP*, 357 U.S. at 460); *Stamos*, 695 S.W.2d at 560 (noting that "right to free speech [and] free exercise of religion . . . have long been recognized as fundamental rights under our state and

34

federal constitutions"). And the United States Supreme Court has explicitly described the peaceable right to assemble, along with other First Amendment rights, as a fundamental right:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and *assembly, and other fundamental rights* may not be submitted to vote; they depend on the outcome of no elections.

*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (emphasis added); *see De Jonge*, 299 U.S. at 364 ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."); *Whitney*, 274 U.S. at 375–76 (J. Brandeis, concurring) ("But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction proposed is required in order to protect the state from destruction or from serious injury, political, economic or moral.").

Based on its prominence in the Texas Bill of Rights, its history in the founding of our country, and its early, and still valid, treatment by the U.S. Supreme Court, we hold that the right to assemble granted by the Texas Constitution is a fundamental right.[7]

---

[7] The dissent suggests that we have overstepped our role as an intermediate court "by declaring a fundamental right to congregate without fully analyzing peaceableness or the advocacy of a matter of public welfare." *See post* at 16. But the fact that we have rejected the dissent's view that the Texas Assembly Clause is limited to advocacy of a matter of public welfare does not mean that we have not taken that argument into account—to the contrary, we address the matter at length. And we note that even if Texas' assembly clause is so limited, the City's ordinance bans assemblies without regard to their content or purpose. We likewise acknowledge that non-peaceable assemblies are not protected by the Assembly Clause, but the City's short-term rental ordinance forbids assemblies whether peaceable or not. Finally, the dissent states that we should leave the determination of fundamental rights to Texas's high courts

4.  *Texas's Right to Assemble and the City of Austin's Ordinances*

What is at stake, then, is the authority of the City, through its ordinances, to prohibit or restrict the peaceable assembly of citizens on private property with respect to the purpose, time, and number of people.  The Property Owners here argue that review of the alleged violation of their fundamental right to assemble by Austin's City Code must be examined under strict scrutiny.  We agree.

Section 25-2-795 of Austin's short-term rental regulations provides that:

(B)     Unless a stricter limit applies, not more than two adults per bedroom plus two additional adults may be present in a short-term rental between 10:00  p.m. and 7:00 a.m.

(C)     A short-term rental is presumed to have two bedrooms, except as otherwise determined through an inspection approved by the director.

(D)     A licensee or guest may not use or allow another to use a short-term rental for an **assembly** between 10:00 p.m. and 7:00 a.m.

(E)     A licensee or guest may not use or allow another to use a short-term rental for an outside **assembly** of more than six adults between 7:00 a.m. and 10:00 p.m.

(F)     For purposes of this section, an **assembly** includes a wedding, bachelor or  bachelorette party, concert, sponsored event, or any similar group activity other than sleeping.[8]

because doing so is "a novel and big step into [a] weighty area."  *Post* at 16.  But our duty as a court requires us to address those matters that are properly before us, including the identification and protection of fundamental constitutional rights.  *See* Tex. R. App. P. 47.1 (requiring appellate courts to  "hand down a written opinion that . . . addresses every issue raised and necessary to final disposition"); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) ("The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution.").

[8]  Because the word "including" is a term of enlargement and not of limitation or exclusive enumeration, the ordinance applies to assemblies other than "wedding, bachelor or bachelorette party, concert, sponsored event, or any similar group activity."  *See Republic Ins.*

(G)     A short-term rental use may not be used by more than:

(1) ten adults at one time, unless a stricter limit applies; or
(2) six unrelated adults.

Austin, Tex., Code, § 25-2-795 (emphases added).  This section plainly restricts the right to assemble and does so without regard to the peaceableness or content of the assembly—as emphasized above, the word "assembly" is used to describe what is being banned or severely restricted temporally, quantitatively, and qualitatively.  Even if it the ordinance did not expressly use the word "assembly," section 25-2-795 represents a significant abridgment of the fundamental right to peaceably assemble—i.e., to get together or congregate peacefully.  It forbids owners (i.e., "licensees" in the ordinance) and tenants from gathering outdoors with more than six persons, at any time of day, even if the property is licensed for occupancy of six or more.  And it prohibits use by two or more persons for any activity "other than sleeping" after 10:00 p.m. *Id.*

Moreover, in contrast to traditional cases that invoke the right to assemble on *public* property, here the right concerns the freedom to assemble with the permission of the owner on *private* property, implicating both property and privacy rights.[9]  *Cf. Members of City*

---

*Co. v. Silverton Elevators Inc.*, 493 S.W.2d 748, 752 (Tex. 1973) (reasoning that it is a "well settled rule that the words 'include,' 'including,' and 'shall include' are generally employed as terms of enlargement rather than limitation or restriction").

[9]     Because we conclude that section 25-2-795 violates the constitutional right to assemble, we do not reach the challenges based on the constitutional rights of association, movement, and privacy. But here privacy rights are implicated in our right-of-assembly analysis. The Texas Constitution "guarantee[s] the sanctity of the individual's home and person against unreasonable intrusion." *Texas State Emps. Union*, 746 S.W.2d at 205; *see* Tex. Const., art. I. §§ 9 (prohibiting unreasonable searches and seizures), 25 (prohibiting quartering of soldiers in houses).  State and federal courts have consistently held that the right to privacy within the home extends to temporary lodging, including hotels, motels, and boarding houses.  *See, e.g.,*

*Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 811 (1984) ("So here, the validity of the esthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property. The private citizen's interest in controlling the use of his own property justifies the disparate treatment."); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) ("Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."); *Texas State Emps. Union*, 746 S.W.2d at 205 ("While the Texas Constitution contains no express guarantee of a right of privacy, it contains several provisions similar to those in the United States Constitution that have been recognized as implicitly creating protected 'zones of privacy.'"); *Koppolow Dev. Inc. v. City of San Antonio*, 399 S.W.3d 532, 535 (Tex. 2013) ("One of the most important purposes of our government is to protect private property rights."); *Spann v. City of Dallas*, 235 S.W. 513, 515 (Tex. 1921) ("To secure their property was one of the great ends for which men entered into society. The right to

---

*Minnesota v. Olson*, 495 U.S. 91, 96–97 (l990) (holding that overnight guest had expectation of privacy); *Stoner v. California*, 376 U.S. 483, 490 (1964) (concluding that "a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures"); *State v. Rendon*, 477 S.W.3d 805. 810–11 (Tex. Crim. App. 2015) (noting that Fourth Amendment protections against warrantless searches extend to "other dwelling place, including apartment"); *Luna v. State*, 268 S. W.3d 594, 603 (Tex. Crim. App. 2008) ("An 'overnight guest' has a legitimate expectation of privacy in his host's home."). Included in the right to privacy is the right to be free from "government action that is intrusive or invasive." *City of Sherman v. Henry*, 928 S. W.2d 464. 468 (Tex. 1996). A violation of this privacy interest turns not on the conduct undertaken by the individual, but on whether the "government impermissibly intruded on [his] right to be let alone," as the Property Owners allege here. *Id*. As the city concedes, enforcement of section 25-2-795 requires visual monitoring by the City or its agents of private activities to detect whether the property owners or tenants are violating the restrictions on how many people are in a bedroom or whether there is a prohibited assembly. *See* Austin. Tex., Code § 25-2-792 (requiring City to notify neighbors in writing of short-term rental's operation and to provide contact information to report any violations).

acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom, guaranteed as inviolate by every American Bill of Rights.").

Surely the right to assemble is just as strong, if not stronger, when it is exercised on private property with the permission of the owner, thereby creating a nexus with property and privacy rights. *Cf. Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("First Amendment protections, furthermore, are especially strong where an individual engages in speech activity from his or her own private property." (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994)). But if Thomas Jefferson, Patrick Henry, and other revolutionary patriots had lived in this modern day and chosen a short-term rental instead of the Raleigh Tavern—as they may well have given the nature of modern society—to assemble and discuss concepts of freedom and liberty, the City of Austin's ordinance would impose burdensome and significant restrictions on their abilities to do so. The City of Austin's restriction of this fundamental right to physically congregate on private property, in a peaceable manner, for the citizens' shared welfare or benefit requires strict scrutiny. *See Washington*, 521 U.S. at 720 (explaining that due-process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests"); *Reno*, 507 U.S. at 301–02 (same); *cf. Barnette*, 319 U.S. at 639 ("The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds."); *De Jonge*, 299 U.S. at 365 ("If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the

public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.").

We do not suggest that the City of Austin is powerless to regulate short-term rentals or to address the possible negative effects of short-term rentals—in fact, it already does so with various nuisance ordinances. *See, e.g.*, Austin, Tex., Code §§ 9-2-1–9-2-65 (noise ordinance), 9-4-15 (prohibiting public urination and defecation), 10-5-42–10-5-45 (littering ordinance), 12-5-1–12-2-44 (parking ordinance); *see also* Tex. Penal Code §§ 42.01 (disorderly conduct), 49.02 (public intoxication). But here the City has not identified a compelling interest that might justify section 25-2-795's restrictions on the right to peaceably assemble on private property. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 71 (1981) ("[W]hen the government intrudes on one of the liberties protected by the Due Process Clause of the Fourteenth Amendment, 'this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.'" (quoting *Moore*, 431 U.S. at 499)). The City's stated concerns in enacting this section were to reduce the likelihood that short-term rentals would serve as raucous "party houses" in otherwise quiet neighborhoods and to reduce possible strain on neighborhood infrastructure. These are certainly valid concerns, but compelling interests in the constitutional sense are limited to "'interests of the highest order.'" *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). These interests may include, for example, reduction of crime, protection of the physical and psychological well-being of minors, parental rights, protection of elections,

and tax collection. *See, e.g.*, *Madsen v. Women's Health Center, Inc*., 512 U.S. 753, 763–64 (1994) (public safety and order); *Burson v. Freeman*, 504 U.S. 191, 198–99 (1992) (integrity of elections); *Ginsberg v. New York*, 390 U.S. 629, 639–640 (1968) (protecting minors). Further, the City must show a compelling interest in imposing the burden on the right to assemble in the particular case at hand, not a compelling interest in general. *See Westchester Day Sch.*, 504 F.3d at 353 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 432 (2006)).

The regulation of property use is not, in and of itself, a compelling interest. *See Barr v. City of Sinton*, 295 S.W.3d 287, 305 (Tex. 2009). As the Texas Supreme Court has explained, "Although the government's interest in the public welfare in general, and in preserving a common character of land areas and use in particular, is certainly legitimate when properly motivated and appropriately directed . . . courts and litigants must focus on real and serious burdens to neighboring properties" when determining whether a compelling interest is at issue. *Id*. at 305–07; *see Bell*, 74 S.W.2d at 545 (noting that "police or governmental powers may be exerted where the object of legislation is within the police power," but "the privileges guaranteed by the Bill of Rights . . . cannot be destroyed by legislation under the guise of police control"). We must "not assume that zoning codes inherently serve a compelling interest, or that every incremental gain to city revenue (in commercial zones), or incremental reduction of traffic (in residential zones), is compelling." *Barr*, 295 S.W.3d at 307. Here, the City has not provided any evidence of a serious burden on neighboring properties sufficient to justify section 25-2-795's encroachment on owners' and their tenants' fundamental right to assemble on private property.

Additionally, the City's restrictions on the right to assemble would still fail strict scrutiny because the ordinance is not narrowly tailored and can be achieved by less intrusive, more reasonable means, such as enforcement of the already-existing ordinances regulating noise, parking, building codes, and disorderly conduct that we discuss above in our analysis of the State's retroactivity claim. *See Reno*, 507 U.S. at 302 (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest").

In sum, we hold that section 25-2-795 infringes on short-term rental owners' and their tenants' constitutionally secured right to assembly because it limits assembly on private property without regard to the peacefulness of or reasons for the assembly. And because the infringement of the fundamental right to assemble is not narrowly tailored to serve a compelling government interest, it violates the Texas Constitution's guarantee to due course of law. *See id.* Accordingly, it was error for the district court to grant the City's no-evidence motion for summary judgment and to deny the Property Owners' motion for summary judgment on the Property Owners' constitutional challenge to this provision.

## C. Unreasonable Search and Seizure

The Property Owners contend that another provision of the short-term rental ordinance place owners and tenants of short-term rentals at risk of unconstitutional search and seizure. Specifically, they challenge the provision that added short-term rentals to the enumerated list of types of property that officials must inspect "to ensure compliance with this chapter and other applicable laws." Austin, Tex., Code § 25-12-213(1301). That provision, however, was modified to allow the licensee or occupant to deny the inspector's entry and to seek pre-search administrative review. *See* Austin, Tex., Ordinance No. 20171012-SPEC001

(Oct. 12, 2017). Thus, although the parties have not briefed this Court on the repeal of the more onerous inspection provisions, we take judicial notice of the ordinance repealing this section and conclude this claim is now moot. *See* Tex. R. Evid. 204 (allowing judicial notice of municipal law); *Trulock v. City of Duncanville*, 277 S.W.3d 920, 929 (Tex. App.—Dallas 2009, no pet.) (dismissing case as moot where challenged provisions of ordinance had been repealed).

## Conclusion

Because Austin City Code sections 25-2-795 (restricting assembly) and 25-2-950 (banning type-2 rentals) are unconstitutional, we reverse that part of the district court's judgment granting the City's no-evidence motion for summary judgment and denying the Property Owners' and the State's motions for summary judgment. We render judgment declaring sections 25-2-795 and 25-2-950 of the City Code void. We affirm the remainder of the judgment and remand the case to the district court for further proceedings consistent with this opinion.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Kelly
  Concurring and Dissenting Opinion by Justice Kelly

Affirmed in Part; Reversed and Rendered in Part; Remanded

Filed: November 27, 2019